**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

---------------------------------------------------------

|   |   |   |
|---|---|---|
| | : | |
| | : | |
| ERIN E. KIS, | : | |
| | : | |
| Plaintiff, | : | Case No. 4:18-cv-54 |
| | : | |
| v. | : | Judge James Gwin |
| | : | |
| COVELLI ENTERPRISES, INC., | : | Magistrate Baughman |
| | : | |
| Defendant. | : | |

---------------------------------------------------------

***

---------------------------------------------------------

|   |   |   |
|---|---|---|
| | : | |
| | : | |
| CHELSEA ROMANO, | : | |
| | : | |
| Plaintiff, | : | Case No. 4:18-cv-434 |
| | : | |
| v. | : | Judge James Gwin |
| | : | |
| COVELLI ENTERPRISES, INC., | : | Magistrate Baughman |
| | : | |
| Defendant. | : | |

---------------------------------------------------------

## <u>DEFENDANT'S MOTION TO DECERTIFY FLSA CLASS</u>

Defendant Covelli Enterprises, Inc. ("Covelli") hereby moves the Court for an order decertifying the FLSA class that was conditionally certified on May 16, 2018 and dismissing without prejudice the claims of the Opt-In Plaintiffs who have filed consents to become part of this case.  The grounds supporting this motion are set forth in the attached Memorandum in Support.

Respectfully submitted,
ICE MILLER LLP


*/s/James E. Davidson*
James E. Davidson (0024534)
Catherine L. Strauss (0072980)
John P. Gilligan (0024542)
250 West Street
Columbus, Ohio 43215
Telephone: (614) 462-2700
Facsimile:  (614) 462-5135
James.Davidson@icemiller.com
Catherine.Strauss@icemiller.com
John.Gilligan@icemiller.com

*Counsel  to  Defendant  Covelli  Enterprises,  Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

---------------------------------------------------------

|                    |   |                        |
|--------------------|---|------------------------|
|                    | : |                        |
|                    | : |                        |
| ERIN E. KIS,       | : |                        |
|                    | : |                        |
| Plaintiff,         | : | Case No. 4:18-cv-54    |
|                    | : |                        |
| v.                 | : | Judge James Gwin       |
|                    | : |                        |
| COVELLI ENTERPRISES, INC., | : | Magistrate Baughman |
|                    | : |                        |
| Defendant.         | : |                        |

---------------------------------------------------------

***

---------------------------------------------------------

|                    |   |                        |
|--------------------|---|------------------------|
|                    | : |                        |
|                    | : |                        |
| CHELSEA ROMANO,    | : |                        |
|                    | : |                        |
| Plaintiff,         | : | Case No. 4:18-cv-434   |
|                    | : |                        |
| v.                 | : | Judge James Gwin       |
|                    | : |                        |
| COVELLI ENTERPRISES, INC., | : | Magistrate Baughman |
|                    | : |                        |
| Defendant.         | : |                        |

---------------------------------------------------------

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DECERTIFY FLSA CLASS

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.  FACTUAL BACKGROUND .........................................................................................2

III.  LAW AND ARGUMENT ...............................................................................................6

    A.  Plaintiffs' Economic Theory of Wage Theft Defies Common Sense and Is Convincingly Debunked by Defendant's Expert, Dr. Walker .......................................6

    B.  Standards For Section 216(b) Certification. ...................................................................7

      1.  Plaintiffs Have The Burden To Show That The Opt-In Plaintiffs Are Similarly Situated To The Named Plaintiffs ............................................................ 7

      2.  Whether Or Not The Plaintiffs Are Similarly Situated Depends Upon Their Actual Job Duties, Not The Fact That They Share A Common Job Title Or Were Classified As Exempt By The Defendant ...................................................... 8

      3.  Courts Consider Whether The Plaintiff Class Is Similarly Situated With Respect To The Factors Set Forth In the FLSA Regulations Governing The Executive Exemption .................................................................................................. 9

    C.  Plaintiffs' Claims and Covelli's Defenses Are Too Individual and Varied to Determine Collectively. ..............................................................................................10

      1.  There is No Evidence of a Corporate Policy of Misclassification of the AM Position as Exempt.................................................................................................. 10

      2.  The Evidence Shows That The AMs Job Duties And Experiences Are So Disparate That The Class Must Be Decertified ......................................................... 12

        (a)  Primary Duty Is Management ............................................................................... 12

          (1)  Management .................................................................................................... 13

            (a) Interviewing, Selecting, And Training Of Employees ........................................ 13

            (b) Setting And Adjusting Employees' Rates Of Pay And Hours Of Work ........... 14

            (c) Directing The Work Of Employees ..................................................................... 15

            (d) Apportioning The Work Among The Employees ............................................... 15

            (e) Appraising Employees And Recommending Promotions Or Other Changes In Status .......................................................................................... 16

            (f) Disciplining Employees ...................................................................................... 17

(g) Determining The Techniques To Be Used..........................................................17

(h) Determining The Type Of Merchandise To Be Bought, Stocked, And Sold ........................................................................................................18

(i) Providing For The Safety And Security Of The Employees ..............................18

(2) Primary duty.........................................................................................18

3. Directing The Work Of Two Or More Other Employees................................24

4. Recommendations For Hiring, Promotion, Or Discipline Given Particular Weight...........................................................................................................24

D. Fairness and Procedural Considerations Militate Against Proceeding as a Collective Action...............................................................................................................25

1. The Declarations Submitted By Covelli Showing Work Experiences Of AMs In Cafés Where Opt-In Plaintiffs Work Suggest That Many Of The Declarants Are Properly Classified As Exempt ....................................................................25

2. The Declarations Show That There Are Significant Differences in Employment Experiences Among The Plaintiff Group As A Whole...................................26

IV. CONCLUSION.......................................................................................................28

CERTIFICATE OF SERVICE .........................................................................................29

CERTIFICATE OF COMPLIANCE ................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Beauchamp v. Flex-N-Gate, LLC*,
    357 F. Supp. 2d 1010 (E.D. Mich. 2005) .......................................................... 19

*Bradford v. CVS Pharmacy, Inc.*,
    308 F.R.D. 696 (N.D. Ga. 2015) ...................................................................... 9

*Burson v. Viking Forge Corp.*,
    661 F. Supp. 2d 794 (N.D. Ohio 2009) ............................................................ 19

*Creely v. HCR ManorCare, Inc.*,
    920 F. Supp. 2d 846 (N.D. Ohio 2015) .................................................. 1, 10, 28

*Donovan v. Burger King Corp.*,
    672 F.2d 221 (1st Cir. 1982) .......................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
    ___ U.S. ___, 138 S.Ct. 1134 (2018) ............................................................... 9

*Green v. Harbor Freight Tools USA, Inc.*,
    888 F. Supp. 2d 1088 (D. Kan. 2012) ............................................................... 9

*Jackson v. Advance Auto Parts, Inc.*,
    362 F. Supp. 2d 1323 (N.D. Ga. 2005) ............................................................ 19

*Johnson v. Big Lots Stores, Inc.*,
    561 F. Supp. 2d 567 (E.D. La. 2008) ....................................................... passim

*Kastor v. Sam's Wholesale Club*,
    131 F. Supp. 2d 862 (N.D. Tex. 2001) ............................................................ 19

*Knott v. Dollar Tree Stores, Inc.*,
    897 F. Supp. 2d 1230 (N.D. Ala. 2012) ............................................................ 9

*Lindsey v. Tire Discounters, Inc.*,
    2017 WL 5972104 (S.D. Ohio Dec. 1, 2017) .......................................... passim

*Mike v. Safeco Ins. Co. of America*,
    223 F.R.D. 50 (D. Conn. 2004) ...................................................................... 11

*Mitchell v. Abercrombie & Fitch, Co.*,
    428 F. Supp. 2d 725 (S.D. Ohio 2006) ............................................................ 19

*Neitzke v. NZR Retail of Toledo, Inc.*,
    2015 WL 9055495 (N.D. Ohio Dec. 16, 2015) .................................................. 8

iv

*O'Brien v. Ed Donnelly Enters, Inc.,*
    575 F.3d 567 (6th Cir. 2009) ................................................................. 10

*Roberts v. Nat'l Autotech, Inc.,*
    192 F. Supp. 2d 672 (N.D. Tex. 2002) ................................................... 19

*Schaefer v. Indiana Michigan Power Co.,*
    358 F.3d 394 (6th Cir. 2004) ................................................................. 19

*Smith v. Heartland Automotive Serv., Inc.,*
    404 F. Supp. 2d 1144 (D. Minn. 2005) ................................................... 9

*Snide v. Discount Drug Mart, Inc.,*
    2011 WL 5434016 (N.D. Ohio Oct. 11, 2011) ........................................ 8

*Thomas v. Speedway SuperAmerica, LLC,*
    506 F.3d 496 (6th Cir. 2007) ................................................. 19, 20, 23

*White v. Baptist Mem. Health Care Corp.,*
    699 F.3d 869 (6th Cir. 2012) ................................................................... 8

**Statutes**
29 U.S.C. § 207(a)(1) ................................................................................... 2

29 U.S.C. § 213(a)(1) ............................................................................. 2, 12

29 U.S.C. § 216(b) .................................................................................. 1, 2

**Rules**
29 C.F.R. § 541.100 ................................................................................... 12

29 C.F.R. § 541.102 ................................................................................... 13

29 C.F.R. § 541.105 ................................................................................... 24

29 C.F.R. § 541.106 ................................................................................... 20

29 C.F.R. § 541.700 ................................................................................... 19

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

> [W]here, as here, the evidence shows that the named plaintiffs and the opt-in
> plaintiffs are not similarly situated, there is no longer any justification supporting
> collective treatment using collective proof.  A collective action is appropriate
> when there are common issues of fact and common issues of law.  Thus, when
> there is agreement between the parties about what employees did, or there is a
> reliable showing that employees performed "substantially similar work," a court
> may properly and easily try plaintiffs' claims collectively….But when there are
> **significant differences in employment experiences**, as the evidence presented at
> trial shows to be the case here, the procedural advantages of a collective action
> evaporate, and the Court's confidence that a just verdict on the merits can be
> rendered is seriously undermined.

*Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587-588 (E.D. La. 2008) (citations and

quotations omitted; emphasis added) (decertifying class following trial).  A collective action

under the FLSA permits the aggregation of many claims, which are adjudicated on the basis of

representative proof.  In order to ensure that the resolution of claims in this manner is appropriate

and accords due process to all parties, Section 216(b) of the FLSA requires that all plaintiffs are

similarly situated.  Where, as the *Johnson* Court put it, there are "significant differences in

employment experiences" across the collective, the justifications supporting a collective action

evaporate.  Put another way, where "Plaintiffs' right to compensation hinges on their individual

experiences," such as where employees holding the same position worked in different locations

and "had different experiences and worked under different managers who may have

implemented Defendant's policy in different ways," the plaintiffs are not similarly situated and a

collective action is not warranted.  *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 857

(N.D. Ohio 2015).

Plaintiffs attempt to aggregate claims by individuals who worked in different Cafés, in

many different locations, under different General Managers, who in turn worked for different

Area Directors of Operations.  The evidence shows "significant differences in employment

experiences," and there is simply no way for Plaintiffs to carry their burden of showing that they

are similarly situated, or that allowing this case to proceed will not trample Covelli's due process rights.

Finally, Plaintiffs' theory of the case is fundamentally flawed.  Plaintiffs contend that Covelli profits from wage theft by failing to pay overtime and misclassifying assistant managers. But unrefuted evidence proves that the opposite is true and that Covelli legitimately classifies assistant managers as exempt, and in fact, that classification increases Covelli's operating expenses.

## II.    FACTUAL BACKGROUND

Plaintiffs are current and former Assistant Managers ("AM") who allege that they worked in Covelli Panera Cafés, and that Covelli unlawfully failed to pay them overtime compensation in violation of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), as a result of their being classified as exempt employees pursuant to 29 U.S.C. § 213(a)(1).  The Plaintiffs brought their claims individually and on behalf of all similarly situated individuals under the FLSA's "collective action" provision, 29 USC § 216(b).

Each Café is run by a General Manager ("GM") and two to three AMs.  (Meier ¶8, Fjeldstad ¶8).[1] There are also Area Directors of Operations who supervise five to eight Cafés apiece.  (Meier ¶1, Fout ¶4, Romph ¶2).  Below the managers are associates, who are hourly employees.  (**Exhibit 5**, Kachmer Declaration ("Kachmer") ¶ 7).  Some associates are also Shift Supervisors and help run shifts. (Fjeldstad ¶8).

---

[1]     Submitted herewith are 10 declarations from AMs who work in Cafés where at least one Opt-In Plaintiff works or has worked, (**Exhibit 1**); 10 declarations from GMs who supervise or supervised at least one Opt-In Plaintiff (**Exhibit 3**); and 6 declarations from Area Directors of Operations who had at least one Opt-In Plaintiff employed as an AM in one of their Cafés, (**Exhibit 4**).  Each declaration is referred to by the last name of the declarant.  For example, the Declaration of Valencia Bell is referred to herein as "Bell ¶1."  Also submitted herewith as **Exhibit 2** is a summary exhibit gathering the AM responses to certain standardized questions ("Summary of AM Declarations").  When these evidentiary materials are compared against the factors set forth in the definition of "management," it is clear that there is inadequate commonality between the Named Plaintiffs and the Opt-In Plaintiffs, so that taken as a whole, when considering the various factors set forth in the regulations, the Plaintiffs are not similarly situated.  **Exhibit 10** provides a listing of each exhibit and its exhibit number.

Each café is a small business that produces approximately $1.5MM to $3MM in sales revenue. Cafés range in size from 5,500 – 6,500 square feet, and are located in shopping and strip malls, as well as, stand-alone buildings. (Kachmer ¶¶4, 17). Each café has an entire bakery, including a designated service area for those daily baked goods and bagels, and a meal-preparation area, where sandwiches, noodle dishes, salads, and soups are prepared. (*Id.* ¶17). Some cafés have a catering component, drive-through service and a delivery service, depending on the service needs of the surrounding area. (Kachmer ¶¶18–20). A team, consisting of a general manager and one to three assistant managers, runs each café and is responsible for the safety of its employees, guests, physical plan as well as the profit/loss performance of each café. Not surprisingly, each café takes on the personality of its management team in how they divide responsibilities and develop strategies to meet their financial goals for their cafés. (*Id.* ¶4).

Given the size and complexity of the Panera Cafés, they need managers on location to run the business. The Cafés are typically open from 6:00 a.m. to 9:00 p.m. or later (longer on Fridays and Saturdays, shorter on Sundays), meaning that they are open for many more hours than a 45-hour per week GM is capable of covering. (Cox Decl. ¶5 (Dkt. 36-4)). Covelli attempts to have a GM or AM in the Café to oversee Café operations most of the hours Cafés are open. During busy times, two managers (GM and an AM) may be needed to run operations. (Beatty ¶ 11; Naples ¶ 13).

AMs are in charge of the Café when the GM is not present (Meier ¶9, Fout ¶17, Coleman ¶4). As one GM put it, "when I am not in the store, assistant managers step into my shoes and are the 'big boss.'" (Allison ¶5). At other times, the AM may be in charge of supervising a particular zone such as the food production line or the bakery, while another AM or the GM is in charge of a different zone. (Coleman ¶4-7). In addition to functioning as the manager in charge

3

when the GM is not present, or serving as the manager of a particular zone, AMs serve many other functions, such as interviewing and helping to select new associates, creating the associate schedule, ordering food and other products and monitoring food costs, taking weekly and monthly inventory, training, supervising associates and ensuring policies are followed, and evaluating and disciplining associates.  (Meier ¶13-15).  Depending upon the GM, some of these functions will be assigned to a particular AM.  (Meier ¶16).  For example, in many Cafés, one AM will create the associate work schedule and make sure that associates receive proper training, and the other AM takes charge of monitoring food costs.  (Meier ¶16). Thus, to some extent, an AM's specific job and duties depends upon which tasks the GM delegated to the AM and are otherwise dependent on the needs of the café.  Also, GMs are not uniform with their delegation and division of labor, which further complicates the make-up of AM responsibilities.  (*See* Coleman ¶¶ 10 (current AMs' responsibilities do not include ultimate hiring authority and formal associate training); 23, 25 (but her former AMs' responsibilities did include making ultimate hiring decisions and formal associate training)).

AMs undergo extensive new job training.  They complete the Manager in Training ("MIT") program, which lasts approximately nine weeks (though it may be shorter for an AM who was promoted from within Covelli); and the program is conducted in a training Café.  It features daily training topics and hands-on practicums geared towards equipping an AM with the tools necessary to succeed as an AM.  (**Exhibit 6**, Scott Shellhorn Declaration ("S. Shellhorn Decl.") ¶¶5-7; Kachmer ¶ 21).

Because a fair amount of discretion is vested in the GM to allocate the responsibilities between the GM and the AMs at a particular Café, the experience from one Café to another varies depending upon the style and judgment of the GM.  (Romph ¶3).  Even within a particular

Café, an AM's experiences and duties will differ depending on the specific duties assigned to that AM. (Heck ¶5, stating that one of her AMs handles scheduling and the other oversees food costs, doing weekly inventory and analysis to see if food is being wasted); Ann Murray ¶6 (discussing division of labor between three AMs); Coleman ¶6 (same for two AMs). AM duties may also change over time (Duncan ¶5 (noting that her AM had previously handled the Sygma truck (food) order but that responsibility had recently moved to the GM due to a schedule change)).

As is detailed in the Declaration of expert witness Jonathan Walker, it would make no economic sense to employ AMs primarily to perform low-wage functions rather than management functions. (**Exhibit 8**, Jonathan L. Walker Declaration ¶5). In fact, it would be significantly cheaper to have associates perform those tasks even if doing so would trigger overtime. (*Id.* ¶ 6-7). For example, Ms. Romano was an existing non-exempt shift supervisor who was promoted to AM, including additional benefits and a significant increase in pay. (*Id.* ¶7). Her compensation increased 75% because she was promoted AM. (*Id.*) It would have been significantly cheaper to keep her as a non-exempt shift supervisor at her prior rate of pay, even if she were to be paid overtime for hours over the 40 hours per week that she worked, rather than pay her substantially more to be an AM, if all that mattered was to get non-management tasks accomplished. (*Id.*). Kis was paid 65% more than an associate performing the duties she claimed she performed. Although Ms. Kis was hired as an AM from outside, the same analysis is true for her. (*Id.* ¶10).

The record developed to date shows that the Plaintiffs' claims and Covelli's defenses are too individual to enable this action to proceed on the basis of "representative" testimony without offending fundamental notions of due process. Each Opt-In's claim will turn on what tasks that

Opt-In performed and whether her primary duty was management, based upon that employee's individual circumstances.  Given these circumstances, Covelli must be permitted to confront and cross examine the witnesses for each individual Plaintiff.  Otherwise, it will be denied its right to due process.

III.    **LAW AND ARGUMENT**

    A.    **Plaintiffs' Economic Theory of Wage Theft Defies Common Sense and Is Convincingly Debunked by Defendant's Expert, Dr. Walker**

Plaintiffs contend that Covelli deliberately misclassified the AMs in order to avoid paying overtime.  In short, Plaintiffs' theory is that in order to control labor costs, Covelli failed to hire sufficient hourly employees, and in turn, insisted that exempt management perform hourly tasks without limitation.  This argument is predicated upon the notion that since the AMs are salaried, they can absorb, without expense, manual tasks that would be otherwise delegated to hourly employees.  If AMs perform tasks that should be delegated to hourly employees, Covelli saves the cost of hiring additional workers and paying them overtime.

This theory flies in the face of economic reality.  As Dr. Walker explains:

> Covelli had no profit motive to promote Ms. Romano to the AM position or hire Ms. Kis as an AM just to avoid overtime for non-exempt work.  Ms. Romano's and Ms. Kis's actual overtime hours as AMs were limited, significantly fewer than they allege in their complaints.  Moreover, the salaries, bonuses, and benefits that Covelli paid Ms. Romano and Ms. Kis were much more than the compensation Covelli would have had to pay to have non-exempt workers put in the hours that Ms. Romano and Ms. Kis did as AMs.  In Ms. Romano's case, Covelli could have paid significantly less by keeping Ms. Romano on a shift supervisor at her preexisting wage and paying her overtime.  <u>In both Ms. Romano's and Ms. Kis's cases, Covelli could have reallocated their hours to associates if its goals were simply to get non-exempt work done, thereby paying significantly less in employee compensation than it actually paid.</u>

(Walker Decl. ¶24 (emphasis added)).

Dr. Walker also opines that variations in job duties make it impossible to determine whether one person's alleged misclassification yields representative evidence as to any other person.  As Dr. Walker states:

> In circumstances such as those in this case where many individuals within an enterprise have the same job title yet report to different supervisors in different work locations subject to different working conditions over four or more years, actual job duties necessarily vary from person to person and perhaps over time.  Variation could theoretically been so extreme that some AMs' primary duties were managerial while others were not. . . .  It is possible for individual AMs to have limited management responsibility although other AMs have extensive management responsibility.  So long as it is plausible that any AMs could have sufficient management authority to qualify as exempt employees, then individualized analysis is necessary to determine whether any particular AMs' actual duties were sufficient to qualify for an exemption.

(Walker Decl. ¶20).

Plaintiffs have not identified an expert, and therefore cannot present competing expert testimony.  Furthermore, Plaintiffs have not conducted a survey of the AMs, and therefore, there will be no statistical evidence or other persuasive evidence that the experience of one or more Opt-Ins is somehow representative of others.   Given these uncontroverted circumstances, Plaintiffs could never develop a reasonable plan for trying the case on a collective basis.  Any trial plan would necessarily fail because there is no basis for demonstrating that the named Plaintiffs' or any Opt-In Plaintiffs' experience is representative of the entire collective.

**B.     Standards For Section 216(b) Certification.**

**1.      Plaintiffs Have The Burden To Show That The Opt-In Plaintiffs Are Similarly Situated To The Named Plaintiffs**

As this Court has noted, "[a]lthough Defendant moves for decertification, Plaintiffs have the burden to show that the Opt–In Plaintiffs are 'similarly situated' to the Named Plaintiffs." *Garcia*, 2015 WL 5022961, *2 (citing *O'Brien*, 575 F.3d at 584); *White v. Baptist Mem. Health*

7

*Care Corp.*, 699 F.3d 869, 877-8 (6th Cir. 2012).  *See also Snide v. Discount Drug Mart, Inc.*, 2011 WL 5434016, *2 (N.D. Ohio Oct. 11, 2011) ("In a FLSA collective action, the plaintiffs bear the burden at all times to demonstrate that the class is similarly situated.").

> **2.      Whether Or Not The Plaintiffs Are Similarly Situated Depends Upon Their Actual Job Duties, Not The Fact That They Share A Common Job Title Or Were Classified As Exempt By The Defendant**

The mere fact that an employer uniformly classifies all employees in a certain job position as exempt does not mean that the employees in that position are similarly situated. *Lindsey v. Tire Discounters, Inc.*, 2017 WL 5972104, *6 (S.D. Ohio Dec. 1, 2017) (looking beyond common job title and position to find that, based upon the plaintiffs' actual job duties, they were not similarly situated).  *See also Neitzke v. NZR Retail of Toledo, Inc.*, 2015 WL 9055495, *2 (N.D. Ohio Dec. 16, 2015) (holding that the Court could not find that plaintiffs were similarly situated based upon job title and description and denying certification where the plaintiffs did not identify any other factors in common that made them similarly situated). Rather, courts hold that the court must evaluate the employees' actual job duties and experiences, and not merely the employer's uniform classification, job title, or job description. *Lindsey*, 2017 WL 5972104, *6 (collecting cases); *see also Johnson*, 561 F. Supp. 2d at 579 (holding that "the Court must look beyond the nominal description of ASMs' job responsibilities to determine whether plaintiffs are similarly situated with respect to their actual job duties," and finding, based upon consideration of the evidence regarding those duties, that the plaintiffs were not similarly situated).

      **3.**    **Courts Consider Whether The Plaintiff Class Is Similarly Situated With Respect To The Factors Set Forth In the FLSA Regulations Governing The Executive Exemption**

In cases involving the executive or other exemptions[2] from the FLSA, courts look to the factors established by the Department of Labor's FLSA regulations governing the exemption, and consider whether the class members are similarly situated with respect to each factor. *Lindsey*, 2017 WL 5972104, \*7-11 (evaluating whether service managers were similarly situated by considering factors set forth in the regulations, decertifying the class after finding that the evidence relating to a majority of those factors was too varied to permit a finding that the plaintiffs were similarly situated); *Johnson*, 591 F. Supp. 2d at 580-589 (same with respect to assistant store managers, finding that their job duties were too varied and inconsistent to permit collective treatment); *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1236-7 (N.D. Ala. 2012) (considering actual duties of store managers to find that their duties were not consistent enough to find that they were similarly situated); *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 698-9 (N.D. Ga. 2015) (looking to actual job duties of plaintiffs to find that they were not similarly situated and decertified the class); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1099-1100 (D. Kan. 2012) (granting motion to decertify based upon lack of uniformity in actual job duties and experiences of plaintiffs); *Smith v. Heartland Automotive Serv., Inc.*, 404 F. Supp. 2d 1144, 1152 (D. Minn. 2005).

For example, in *Johnson,* the court considered a collective of assistant store managers, and found that there were "significant differences in employment experiences" such that "the procedural advantages of a collective action evaporate, and the Court's confidence that a just

---

[2]     For many years, courts stated that the exemptions to the FLSA should be construed narrowly in light of the FLSA's remedial purposes. The Supreme Court earlier this year abolished this principle, and ruled that FLSA exemptions instead should be given a fair reading based upon their plain language. *Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 138 S.Ct. 1134, 1142 (2018).

verdict on the merits can be rendered is seriously undermined." As a result the court decertified the collective. 561 F. Supp. 2d at 587-588. Likewise, in *Creely*, 920 F. Supp. 2d at 857, Judge Zouhary noted that "Plaintiffs' right to compensation hinges on their individual experiences." Noting that "these individuals had different experiences and worked under different managers who may have implemented Defendant's policy in different ways," he found that they were not similarly situated and decertified the collective. *Id.*

C. **Plaintiffs' Claims and Covelli's Defenses Are Too Individual and Varied to Determine Collectively.**[3]

Plaintiffs cannot show that the job duties among the Plaintiffs as a collective, particularly with respect to the factors identified as critical in the FLSA regulations, are similar enough to find that they are similarly situated. An examination of the AM's actual experience reveals that the AM's are not similarly situated and that it would be unjust to Covelli if the collective is not decertified.

1. **There is No Evidence of a Corporate Policy of Misclassification of the AM Position as Exempt.**

To be "similarly situated" means that the Plaintiffs "suffer from a single, FLSA-violating policy," which requires "a showing beyond allegations of multiple, even if similar, FLSA violations." *Garcia*, 2015 WL 5022961, *2. In *Garcia*, this Court considered a motion to decertify an FLSA claim at a Japanese restaurant chain where an alleged collective of hourly employees claimed that they had not been paid overtime when their restaurants stayed open late. However, the Court noted that "each store presented a separate factual setting. Managers were different across locations." 2015 WL 5022961, *3. As such, the Court found that the plaintiffs

---

[3] Under *O'Brien v. Ed Donnelly Enterprises, Inc.*, the first two considerations are (1) the factual and employment settings of the individual plaintiffs, and (2) the different defenses to which the plaintiffs may be subject on an individual basis. 575 F.3d at 584. As noted in cases such as *Lindsey*, in a case such as this, where the issue is whether the Plaintiffs are properly classified as exempt, these two considerations merge and essentially duplicate each other. 2017 WL 5972104, *12.

could not demonstrate a "single FLSA-violating policy," holding that "there must be a showing beyond mere similarity."  2015 WL 5022961, *3.  Because the plaintiffs could not demonstrate such a policy, this Court decertified the class.

Where "class membership is not founded upon a [company] policy or other generalized proof, but rather on the fact-specific determination of each individual's day to day tasks," proceeding collectively is not appropriate.  *See, Mike v. Safeco Ins. Co. of America*, 223 F.R.D. 50, 54 (D. Conn. 2004).  In *Mike*, the Court declined to certify a collective of insurance claims representatives alleged to be exempt under the FLSA's administrative exemption because there was no allegation about a class-wide policy.  Rather, because each individual's actual duties would need to be evaluated, the Court found that the plaintiffs as a group were not similarly situated.

Here, Plaintiffs can point to no such evidence of a uniform policy that violates the FLSA. While Plaintiffs Kis and Romano testified that they believed that their non-managerial tasks were their most important duties, Covelli now submits 10 declarations from AMs who work in the same Cafés as the Opt-In Plaintiffs, along with 10 GM declarations from GMs who manage Cafés with Opt-In Plaintiffs who work or worked there, and 7 Area Director of Operations declarations, again from individuals with responsibility for Cafés where Opt-In Plaintiffs work or worked.[4]  These declarations demonstrate that the AMs – including the opt-in Plaintiffs those declarants observed – regularly engaged in numerous duties defined as "management" in the regulations, and have or had management as their primary duty.

---

[4]    Attached as **Exhibit 9** is a chart showing the Cafés where each declarant worked and the Opt-Ins identified by that declarant.

2.    **The Evidence Shows That The AMs Job Duties And Experiences Are So Disparate That The Class Must Be Decertified**

In the absence of an express or *de facto* policy to violate the FLSA, the Plaintiffs must show that there is sufficient uniformity in their job duties to permit resolution of their claims on a collective basis.  But in this regard, the Plaintiffs as a class are like the plaintiff classes in *Lindsey*, *Johnson*, and the other cases discussed above.  The AM's experiences, job expectations, and duties vary based upon their Café location, their General Managers, their Area Director, the amount of time that they have been on the job, and other factors.  When compared against the factors set forth in the regulations promulgated by the Department of Labor, the evidence is simply too varied and inconsistent to permit a finding that the Plaintiffs are similarly situated.

Under 29 C.F.R. § 541.100, there are four criteria to determine whether or not an employee is exempt as a "bona fide executive" under 29 U.S.C. § 213(a)(1): a bona fide executive is an employee (1) that is paid a salary of at least $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a)(1).  There is no dispute that the Plaintiffs are all paid in excess of $455 per week.

(a)    Primary Duty Is Management

This factor is made up of two elements.  The first is whether the AM is involved in management.  The second is whether those management tasks constituted the AM's primary duty.

12

(1)    Management

The Department of Labor has set forth an extensive but non-exclusive list of tasks that constitute "management."  *See* 29 C.F.R. § 541.102.  The evidence before the Court on these factors demonstrates that the duties performed by each AM are not consistent from AM to AM, whether the AMs worked in the same or different Cafés.

(a)    Interviewing,    Selecting,    And    Training    Of Employees

**Interviewing and Selecting:**

As shown on Exhibit 2, seven of the 10 AM declarants indicated in their responses to question 10 that they participated in interviewing associate and shift supervisor candidates.  And of the three that did not, one (Houpt) stated that he had interviewed approximately 10 candidates, when the hiring manager was unavailable for some reason (Houpt ¶10).  Likewise, seven of the 10 AM declarants also stated that they screened prospective candidates' resumes (Ex. 2. (responses to Question 11)).  Roughly half testified that they had the ability to veto a candidate. (*Id.* (question 13)).

A number of GMs testified that their AMs are involved in initial interviews and help cull the applicants, so that only those candidates who make it past the initial interview will be interviewed by the GM.  (Coleman ¶8, J. Shellhorn ¶¶11).  In fact, some of the GMs delegate more responsibility to their AMs, so that their assistant managers are able to make hiring decisions.  (Murray ¶4; Allison ¶6; Brown ¶27).[5]  In contrast, other GMs reported that they maintain the primary responsibility to hire new associates (Duncan ¶4).  However, even in Duncan's Café, the AMs are empowered to hire a new associate after confirming the new associate's pay rate with the GM (*Id.*).

---

[5]    Again, these are GMs who supervise Cafés where one or more Opt-In Plaintiffs work or worked.  **Ex. 9**.

13

**Training:**

AMs from Cafés with Opt-In Plaintiffs are involved in training associates.  In particular, almost all of the AM declarants from Cafés with Opt-Ins stated that they were involved in training associates, with numbers ranging from 2 to 30 over the past year.  (Ex. 2, Summary of AM Declarations response to Question 16).  Baylee Fenton, AM in Café 4754, said that she felt her most important responsibility was "training my associates properly.  Giving them feedback and making sure they understand the correct way to do their jobs."  (Fenton ¶6).

In comparison, Plaintiff Kis testified that she was not involved in training.  (Kis Depo., Dkt. No. 124-1, p. 21).  But whereas Kis testified that neither she nor Julie Steed, the other AM in her Café, were involved in training (*Id*.), Steed testified that she has trained 10-20 employees in the past year (Steed ¶16).  She stated that this consisted of "going over shift routines, verifying dress code, putting them onto computer e-learning videos, overseeing training plan with their associate trainer.  I have also trained associates being promoted to shift supervisors.  I train shifts on opening/closing the store, counting drawers & the safe along with shift routines."  (*Id*.).

        (b)  Setting And Adjusting Employees' Rates Of Pay And Hours Of Work

Six of 10 AMs reported being involved in this role, primarily in terms of scheduling. (Ex. 2, Summary of AM Declarations, question 17).  In many Cafés, one of the AMs is assigned the responsibility for formulating the schedule.  So even in the same Café, AM responsibilities for scheduling will not be consistent from one AM to another AM.  Here again, while Kis testified that the schedule in her Café was created by a shift supervisor, Julie Steed, her fellow AM, testified that she prepares the work schedule for the associates and shift supervisors.  (Steed ¶¶17, 34). Jamie Shellhorn, who was Kis' GM, also testified that she has the more seasoned AM prepare the associate schedule.  (J. Shellhorn ¶4).  Indeed, numerous GMs and Area Directors

testified that they have one of their AMs in charge of preparing the schedule. (*See, e.g.*, Heck ¶4, Coleman ¶10a; Beatty ¶7, Meier ¶16, Fjeldstad ¶14, Romph ¶17).  One GM, TJ Starr, stated that he prepares the schedule with input from his AM, who covers training, to ensure that associates are scheduled to ensure proper training (Starr ¶14).  Many AMs also reported being involved in creating associate evaluations, which are used to review associates and adjust their pay. (Tufts ¶7, Steed ¶7, Bell ¶7, Houpt ¶7).

Other AMs are involved in setting pay .  In fact, Geoffrey Brown, AM in Café 4795 in Grandview, Ohio, where several Opt-Ins have worked, reported that he had recently interviewed a few job applicants that really impressed him, so that he wanted to pay them more than the approved rate, so he worked with the regional manager to get that rate approved (Brown ¶27).

### (c)   Directing The Work Of Employees

All 10 of the AM declarants stated that they are responsible for directing the work of employees.  (Ex. 2, Summary of AM Declarations, question 18).  Baylee Fenton ensures that associates are doing their jobs the way they should be done as one of the most important aspects of her job.  (Fenton ¶5).  The GMs likewise testified that their AMs were expected to oversee operations at the Café when on duty, and to correct issues and direct others to correct issues.  (J. Shellhorn ¶10, Murray ¶10, Coleman ¶12).

This stands in stark contrast to Kis' testimony, who said she wasn't really supervising or directing anyone because they already knew what to do.  (Kis Depo. Dkt No. 124-1, p. 25).  Romano largely said the same thing.  (Romano Depo. Dkt. No. 124-16, p. 103).

### (d)   Apportioning The Work Among The Employees

All of the AMs stated that they give direction and/or assign tasks to employees.  (Ex. 2, Summary of AM Declarations, question 18).  In addition, many of the AMs who were responsible for associate scheduling would be in charge of apportioning work among employees

by virtue of making the schedule.  Many GMs also testified that the AMs handle or help handle this task.  (*See, e.g.*, Naples ¶12; Murray ¶7; Duncan ¶6; Allison ¶3; J. Shellhorn ¶¶7-8; Coleman ¶12).

(e)      Appraising Employees And Recommending Promotions Or Other Changes In Status

Almost all of the AM declarants testified that they were responsible for evaluating associates and most stated that they completed associate performance evaluations.  (Exhibit 1, AM declarations ¶7).  AM Geoff Brown reported observing an associate working in the drive-thru line, and recognized strengths that he believed would suit her for management; he worked to promote her, and she is now his Café's newest shift supervisor.  (Brown ¶26).  Julie Steed states that she looks for a good work ethic among employees, and someone who can take on a leadership role.  (Steed ¶26).  She further said that her GM looks to the AMs for opinions on promotions and to perform evaluations.  (*Id.*).

The GM declarations are not entirely consistent.  Two GMs stated that they viewed associate evaluations as primarily their responsibility, except where the GM had not worked with the associate because there was no overlap in their shifts (Allison ¶9; Heck ¶14).  Even in these cases, though, the AMs complete Performance Observation Forms as part of the associate training process.  (Heck ¶7).  TJ Starr testified that she view associate evaluations as a collective endeavor between the GM and the AMs:  "I, along with my assistant managers, complete shift supervisor and associate reviews.  We review associates daily as they conduct their day-to-day jobs.  I expect the assistant mangers to coach and as needed prepare write-ups of associates."  (Starr ¶9).  Other GMs stated that they followed a similar process (Coleman ¶9; Murray ¶5; J. Shellhorn ¶7).

Again, this stands in contrast with Kis' testimony.  Kis said that she never had any input

16

into associate evaluations.  (Kis Depo., Dkt. 124-1 p. 53).  But the evidence from the Café where she worked and other Cafés where Opt-Ins work, plainly demonstrates that this factor cannot be resolved on a collective basis.

(f)    Disciplining Employees

Eight of the 10 AMs reported involvement in various levels of employee discipline, such as verbal coaching of associates on the correct manner to accomplish tasks, the dress code, written discipline, and sending associates home.  (Ex. 2, Summary of AM Declarations questions 24-25).  GMs likewise reported that they expected their AMs to be involved in disciplining employees.  Some required their AMs to recommend termination to them (J. Shellhorn ¶¶12-13, Murray ¶11; Coleman ¶18); others empowered their AMs to make disciplinary decisions up to termination (Allison ¶5, ¶¶11-12).  Even those GMs who do not permit the AMs to terminate an employee expect their AMs to handle discipline at lesser levels.  Likewise, the Area Directors of Operations stated that they expected that the AMs would impose discipline as needed. (Meier ¶15, Fjeldstad ¶13, Romph ¶10, Roman ¶13).

(g)    Determining The Techniques To Be Used

Several AMs stated that they were responsible for ensuring that associates handled operations correctly, from food portioning to customer service.  Indeed, several AMs from Cafés with Opt-Ins stated that ensuring that work was done properly was one of the most important parts of their job duties.  (Durkee ¶6: most important part of job is "enforcing rules and standards;" Fenton ¶6: "training my associates properly.  Giving them feedback and making sure they are understanding the correct way to do their jobs.")  GMs also reported delegating that responsibility to AMs. (Naples ¶8 ("I delegate [to the AMs] the responsibility to manage cleaning duties, oversight of associate work, including proper meal preparation and food portioning, and all related training.")).

17

                (h)     Determining The Type Of Merchandise To Be Bought, Stocked, And Sold

In many Cafés, the responsibility for food and paper inventory is allocated to one AM, while the responsibility to set the schedule is assigned to another AM.  Thus, the AM who is in charge of food inventory is not typically the scheduling person (Murray ¶6a-c; Duncan ¶5).  One AM reported that he is "solely responsible for writing pan-ups, or dough and bake orders, which are a core part of our daily operations."  (Brown ¶36 ("pan-ups" are a Café's dough order)).

                (i)     Providing For The Safety And Security Of The Employees

The declarant AMs uniformly testified that they were responsible for Café security and cash security.  (Ex. 2 Summary of AM Declarations, questions 28-29).  Katilin Sparks, an AM who submitted a declaration in April and who works in a Café where Opt-Ins worked, reported that "I am responsible for any and all customer and employee security.  I am also responsible for making sure everyone is following all safety and security protocols."  (Sparks, ECF 36-3, p. 20 ¶21).  Eight of 10 reported that they are responsible for emergencies even when not on duty.

Taken as a whole, this evidence reveals significant differences in employment experiences among the Plaintiff class, which varies by location and GM, and which demonstrates that the Plaintiffs cannot carry their burden of showing that they are similarly situated regarding whether they are performing management tasks.

                (2)     Primary duty

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the

facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).[6]

One of the central issues is whether the Opt-In AMs have "management" as their primary duty. Time spent performing non-exempt duties is not determinative under the executive exemption. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 503-4 (6th Cir. 2007). Rather, "'[p]rimary duty' does not mean the most time-consuming duty; it instead connotes the 'principal' or 'chief'—meaning the most important—duty performed by the employee." *Id.* (citing *Burger King I*, 672 F.2d at 226-7).

An employee's "primary duty" is not necessarily the same as what an employee "primarily does." Rather, an employee's "primary duty" is what he or she does that is of principal value to the employer, not the collateral tasks that he or she may also perform. This is true even if the employee spends over 50 percent of his or her time on those collateral tasks. *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004) ("A job duty that occupies less than fifty percent of the employee's time can still be the primary duty if that duty is of principal importance to the employer or if the other duties performed are collateral to that duty."); *Thomas*, 506 F.3d at 504; *Lindsey*, 2017 WL 5972104, at *8.[7]

---

[6] In this regard, the fact that an employer has well-defined policies and that an employee's tasks are spelled out in great detail in those policies does not disqualify an employee from being properly classified as exempt, since "[e]nsuring that company policies are carried out constitutes the 'very essence of supervisory work." *Donovan v. Burger King Corp.* ("*Burger King I*"), 672 F.2d 221, 226 (1st Cir. 1982); *Burson v. Viking Forge Corp.*, 661 F. Supp. 2d 794, 802 (N.D. Ohio 2009); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 743 (S.D. Ohio 2006); *Beauchamp v. Flex-N-Gate, LLC*, 357 F. Supp. 2d 1010, 1017 (E.D. Mich. 2005). *See also Thomas*, 506 F.3d at 506-8 (holding that active supervision and detailed policies does not mean that an employee is not acting in a management capacity).

[7] *See also, Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (assistant managers who spent much of their time performing routine non-managerial tasks nevertheless had management as their primary duty where managing and directing the day-to-day store operations was their most important function); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866-67 (N.D. Tex. 2001) (employer entitled summary judgment against manager of bakery who claimed to spend 90 percent of time performing non-managerial tasks); *Roberts v. Nat'l Autotech, Inc.*, 192 F. Supp. 2d 672, 679 (N.D. Tex. 2002) ("Even if, as the Plaintiff contends, he spent the majority of his time . . . answering the phone, driving customers to and from work, going and

As the Sixth Circuit noted in *Thomas*,

> If Thomas failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively. After all, most of us—even if unwillingly—have visited and spent our money at filthy gas stations with sparsely stocked shelves. If, however, Thomas failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks. . . .  We therefore conclude that Thomas's managerial duties were much more important to Speedway's success than her non-managerial duties.

506 F.3d at 505.[8]  In this regard, the expert testimony of Jonathan Walker is telling.  Walker notes that Plaintiff Romano was given nearly a 75% increase in pay when she was promoted to AM.  As Walker notes, she was expected to manage for that additional compensation, for it would have been far cheaper to simply hire an additional hourly worker, or even to pay Romano on an overtime basis.  (Walker Decl. ¶¶7-8).

Moreover, as the Regulations acknowledge, an employee may perform both exempt and non-exempt work at the same time without losing the exemption.  29 C.F.R. § 541.106(b) states:

> For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.

Indeed in such "concurrent duty" situations, "The time factor is less momentous, and might even be somewhat misleading, where the employee's management and non-management functions are not clearly severable."  *Thomas*, 506 F.d at 504-5.

---

getting parts that were not delivered on time, and cleaning the bathroom, the Plaintiff's primary importance to National was as manager of his store.").

[8]    *Thomas* was decided under the former regulations but indicated that its decision would guide cases under the then-new regulations: "because the current and former regulations are so similar, our resolution of this case under the former regulations provides guidance to courts performing the 'primary duty' analysis under the current regulations."  506 F.3d at 503, n. 5.

The individual AM experiences vary significantly.  While the Plaintiffs have testified that, in their view, one or another of the various "non-exempt" tasks that they performed was their "primary duty," (Romano Depo., Dkt. No. 124-16, p. 100, Kis Decl., Dkt. No. 29-4 ¶¶ 8, 17), other AMs have testified that they view their most important duty as:

- "training my associates properly.  Giving them feedback and making sure they understand the correct way to do their jobs."  (Fenton ¶6);

- "Run shift, help out where needed, fill in any gaps in coverage."  (Meier ¶6);

- "Managing the needs of staff and guests so that our restaurant may succeed." (Tufts ¶6);

- "to support the Café operations through systems placed by Panera Bread and Covelli Enterprises." (Magons ¶6);

- "to come in and help keep the Café running smoothly.  Make sure associates are in proper uniform, nothing is needed right away, especially baking product." (Steed ¶6);

- "Running daily operations, ensuring our customers are well taken care of, and our associates are secure and content in their jobs" (Brown ¶6);

- "Customer satisfaction."  (Houpt ¶6);

- "to make sure everything is prepared and compete to run a good shift.  Task are complete, food preparation complete, etc." (Bell ¶6);

- "Enforcing rules & standards."  (Durkee ¶6).

The GMs likewise agreed that an important aspect of the AM job is to have someone in the Café who is charged with running the Café correctly even when the GM is not there. (Coleman ¶4; Murray ¶3; Allison ¶5 ("when I am not in the store, assistant managers step into

my shoes and are the 'big boss.'"), Duncan ¶3).  Many GMs stated that their AMs are part of the management team, running the Café when the GM is not there and overseeing other responsibilities, which vary by GM, but typically involve scheduling, food cost management, and training.  (*See, e.g.*, Beatty ¶¶3, 4, 7, 9; Allison ¶¶3, 5; Coleman ¶¶3, 4; Duncan ¶¶3, 5; J. Shellhorn ¶¶2, 3; Murray ¶¶2, 3).

Special insight about the AM duties in Café 4635 in Wadsworth, Ohio, where Plaintiff Kis worked, originates from Isabella Roman, an hourly associate working at that Café.  In her declaration, Ms. Roman stated that when she was working and had a question about her job, she would ask Julie Steed, her AM, for direction.  (*See* **Exhibit 7**).  Ms. Roman further testified that Ms. Steed "tells us what needs to get done, helps us as we go, and is overall nice about everything."  (*Id.* ¶¶9, 32).  She further reported that she receives verbal coaching from an AM a couple times a shift.  (*Id.* ¶24).  Finally, Roman testified that "when I worked with Erin Kis, she was helpful and was positive toward employees and customers."  (*Id.* ¶33).

GM Naples also addressed several Opt-Ins who worked for her.  She described one of them, Mark Sertich:

> I am familiar with Mark Sertich.  I was the general manager for Mark from approximately 2011 until 2015 at Café 3383.  During this time, Mark was an associate, shift supervisor, and assistant manager.  As an assistant manager, Mark was in charge of creating the schedule for the associates and training of associates.  He oversaw the training matrix, which details the areas of training of the Café.  Mark would review the matrix for each associate to ensure that they were trained in all areas over time.  Additionally, Mark was the assistant manager who was primarily in charge of closing the Café one or two times per week.  Furthermore, I incorporated Mark's input on hiring decisions.  Mark, like me, took cleanliness and proper maintenance of the café seriously.  Mark also verbally coached associates, as part of formal training and also when he managed shifts.  Mark was my "right hand" assistant manager, he was very good at managing the café to my standards.

(Naples ¶17).

Area Director of Operations Colton Meier offered the following observation about Opt-In Tyler Wilkey: "25. Tyler was an assistant manager between early 2014 and 2015. Tyler was a rock-star and did everything he was asked to do as an assistant manager. He was subsequently promoted to general manager in 2015 because he did so well at his job. Tyler worked directly under me. Tyler was an exemplar assistant manager and had full responsibility for hiring and firing. In light of his stellar performance, he was promoted to general manager." (Meier ¶25). Meier also identified Opt-In Joseph Payne, who is a training specialist in his Café and developed his own system to train associates, shift supervisors and new AMs. (Meier ¶20).

These are just a few examples, but they demonstrate that there is substantial evidence conflicting with Plaintiffs Kis and Romano's testimony. There is also material conflict between this record and what the named Plaintiffs describe as the experience of other AMs.

In addition, many AMs and GMs stated that an important part of the AM job was to act as the person in charge of the Café when the GM is not there, and also to be in charge of a particular zone in the Café when the GM is present but monitoring another zone. For example, GM Jodi Naples noted that "it is important for the manager on duty to remain mobile to address needs throughout the Café. The manager on duty can assist an associate in completion of a task, such as preparing a meal, but she must be otherwise available to handle other work. During busy shifts (e.g., lunch), two managers will work the shift. One manager will oversee half of the store—the food preparation line—and another manager will oversee the other half—cashier and bakery area." (Naples ¶13). Other GMs testified similarly. (*See, e.g.*, Coleman ¶¶4, 17; Murray ¶3; Allison ¶5 ("when I am not in the store, assistant managers step into my shoes and are the 'big boss.'"), Duncan ¶3). As many Courts have held, being in charge of a retail establishment is part of management. *Thomas*, 506 F.3d at 504.

23

### 3. Directing The Work Of Two Or More Other Employees

All of the AM declarants reported that they directed five or more employees on a typical shift. (Ex. 2 Summary of AM Declarations, question 9). None of the AM declarants suggested that there was anything nominal or superficial about this supervision. However, Kis testified that while she was manager on duty around a quarter of the time she worked, she was never really in charge and did not have anyone report to her. (Kis Depo., Dkt. No. 124-1, at 21-22). Therefore the evidence is conflicting on this issue, precluding a finding that the Plaintiffs are similarly situated. *See Lindsey*, 2017 WL 5972104, *11 (where some of the plaintiff class claimed that they only nominally oversaw the work of other employees, but other members indicated that they actually were engaged in supervision, they were not similarly situated for this prong of the executive exemption).[9]

### 4. Recommendations For Hiring, Promotion, Or Discipline Given Particular Weight

On this prong of the exemption, the material issue is whether making suggestions and recommendations is part of the employee's job duties, the frequency with which such recommendations are made or requested, and the frequency with which those suggestions and recommendations are relied upon. 29 C.F.R. § 541.105. Further, "an employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id*.

The newly submitted declarations show that AMs provide input that is given significant weight on decisions to hire, fire, promote and give raises to associates and shift supervisors,

---

[9]     Even if the AMs uniformly supervised two or more employees, that would not help their request to proceed as a collective action, because that would show that the factor is satisfied. If the evidence is uniform in a way that does not violate the FLSA, that does not establish that the Plaintiffs are similarly situated. *See, e.g., Garcia*, 2015 WL 5022961, *2 (requiring evidence of an FLSA-violating policy).

contrary to the testimony of Plaintiffs Kis and Romano. This evidence reveals significant differences in employment experiences, and Plaintiffs cannot satisfy their burden to show that they are similarly situated.

Accordingly, with respect to the first two *O'Brien* factors (the factual and employment settings of the individual plaintiffs and the different defenses to which they may be subject on an individual basis), the evidence simply does not permit the conclusion that the employees are similarly situated. To be sure, they share the same job title, but there is little else that is consistent across the conditional class.

**D.      Fairness and Procedural Considerations Militate Against Proceeding as a Collective Action.**

**1.      The Declarations Submitted By Covelli Showing Work Experiences Of AMs In Cafés Where Opt-In Plaintiffs Work Suggest That Many Of The Declarants Are Properly Classified As Exempt**

With this Motion, Covelli submits ten declarations from AMs who worked in the same Cafés as some of the Opt-Ins. These declarants are involved in management activities, and their testimony shows that they had management as their primary duty. Their testimony is buttressed by declarations ten GMs and seven Area Directors of Operations.

In addition to this evidence, many of the declarations submitted by Covelli in April were also executed by AMs at Cafés with one or more Opt-Ins, and they too support the conclusion that AMs in those Cafés are properly classified as exempt. For example, Haleigh Smallwood has been an AM at Café Number 4775 in Columbus, Ohio, where four Opt-In Plaintiffs also worked. In that capacity, she supervises 15 employees on a typical shift. While she once prepared the work schedules, she now prepares the training schedule but does not write the main schedule. She views herself as the second in command. She oversees training, hiring, café delivery, and monitors closing standards. In the past, she was responsible for food costs, and ordering their

25

truck for food and paper inventory.  She currently does the Café's mid-month and end-of-month inventory counts.  (Dkt 36-3, p. 13-14).  Kaitlin Sparks, who works in Café 4792 in New Albany, Ohio, where seven Opt-In Plaintiffs work or worked, is "responsible for any and all customer and employee security."  She is "also responsible for making sure everyone is following all safety and security protocols."  (Dkt. 36-3, p. 19-20).  Brandon Martell, who was an AM in Café 4761 in Reynoldsburg, Ohio and Café 4792 in New Albany, Ohio, where eight Opt-In Plaintiffs worked, runs the Sygma (food and paper product) order for his current Café, and was the training specialist at his former Café.  (Dkt 36-3, p. 42).

### 2. The Declarations Show That There Are Significant Differences in Employment Experiences Among The Plaintiff Group As A Whole

Collective treatment of Plaintiffs' claims is inappropriate because of the need to inquire into the particular experiences of each individual AM in order to establish the executive exemption as an affirmative defense.  In *Johnson*, the Court found that such significant differences in employment experiences compelled decertification because it the Court was not confident that it could fairly decide the case in a representative manner without considering the specific circumstances of each individual plaintiff.  561 F. Supp. 2d at 578.  The same is true here.  The evidence demonstrates that there are too many such significant differences on the critical factors that the Court must apply to decide the executive exemption on the merits to permit the case to proceed in a collective manner.

The absence of convincing evidence that the Plaintiffs are similarly situated means that a determination of the exempt or non-exempt status of *all* of the Plaintiffs collectively, on the basis of "representative" testimony, would be patently unfair.  Any "across-the-board" determination of Plaintiffs' exempt or non-exempt status based on declarations and limited deposition testimony would likely either result in some Plaintiffs receiving an undeserved windfall, some

26

being denied what is rightfully owed to them, or both. *See Johnson*, 561 F. Supp. 2d at 588 (where plaintiffs were not similarly situated, proceeding to determine the claims in a collective manner was unfair to both sides).

Determination of Plaintiffs' claims on a collective basis may be superficially appealing, however, the risks inherent in proceeding in such a fashion are realized when examining the small sampling of Plaintiffs from whom discovery has been taken. If the Court allows this case to proceed to trial as a collective action, many opt-in Plaintiffs will "fly under the radar," in effect having their claims for overtime pay determined without ever providing evidence regarding their job duties, or having their evidence tested by cross-examination or competing testimony of other witnesses. The observations of Judge Vance in *Johnson*, where the pretrial motions to decertify were denied, only to be granted when renewed at the close of the trial, where the evidence had revealed "significant differences in employment experiences," are equally compelling here: "Employees' experiences may not need to be identical in order to for the employees to be similarly situated. But wide-ranging diversity along key criteria as is the case here makes collective adjudication imprudent. The Court cannot reliably find for either party in light of the evident differences among the plaintiffs." *Id.* at 586.

Similarly, the *Lindsey* court stated that "when Plaintiffs are unable to demonstrate that employees are similarly situated, there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the employer] and manageability problems for the Court…The facts and circumstances of the SMs' employment, as it relates to the components of the executive exemption, are so varied that no judicial economy would be gained by proceeding as a collective action." *Lindsey*, 2017 WL 5972104, *13. Like *Johnson* and *Lindsey*, among other cases, this record reveals a diversity of experience and actual

job duties.

As Judge Zouhary recently observed when he decertified an FLSA collective,

. . . Plaintiffs' right to compensation hinges on their individual experiences.  It is unclear how proceeding collectively and using representative testimony would be fair or useful.  For example, this Court does not find that representative testimony from licensed practical nurses in one location would necessarily be representative of individuals who held even the same position in another location.  These individuals had different experiences and worked under different managers who may have implemented Defendant's policy in different ways.

*Creely*, 920 F. Supp. 2d at 857. The same principles apply here.

**IV.**   **CONCLUSION**

For the foregoing reasons, Defendant Covelli's Motion to Decertify this action as a collective action should be granted.

> Respectfully submitted,
> ICE MILLER LLP
>
>
> */s/ James E. Davidson*
> James E. Davidson (0024534)
> Catherine L. Strauss (0072980)
> John P. Gilligan (0024542)
> 250 West Street
> Columbus, Ohio 43215
> Telephone: (614) 462-2700
> Facsimile:  (614) 462-5135
> James.Davidson@icemiller.com
> Catherine.Strauss@icemiller.com
> John.Gilligan@icemiller.com
>
> *Counsel to Defendant Covelli Enterprises, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of November, 2018, the foregoing has been filed with the Court electronically and service will be made through the Court's CM/ECF System.

*/s/  James E. Davidson*
James E. Davidson

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ohio LR 7.1(f), the undersigned hereby certifies that this case has been assigned to the standard case track, and that the Court entered an order on November 1, 2018 expanding the page limit for this Motion to 28 pages.

*/s/  James E. Davidson*
James E. Davidson