# **EXHIBIT 8**

Declaration of Jonathan L. Walker.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **ERIN E. KIS, on behalf of herself and all others similarly situated,** | \| | |
| | \| | |
| **Plaintiff** | \| | |
| | \| | |
| **v.** | \| | **Case No. 4:18-cv-00054-JG** |
| | \| | |
| **COVELLI ENTERPRISES, INC.,** | \| | |
| | \| | |
| **Defendant** | \| | |
| | \| | |

-------------------------------------------------------

| | | |
|---|---|---|
| **CHELSEA ROMANO, individually and on behalf of all others similarly situated,** | \| | |
| | \| | |
| **Plaintiff** | \| | |
| | \| | |
| **v.** | \| | **Case No. 4:18-cv-00434-JG** |
| | \| | |
| **COVELLI ENTERPRISES, INC.,** | \| | |
| | \| | |
| **Defendant** | \| | |
| | \| | |

-------------------------------------------------------

## <u>DECLARATION OF JONATHAN L. WALKER</u>

### I.     Introduction

1.  I was retained by the Defendant, Covelli Enterprises, Inc. ("Covelli"), to develop and render an economic opinion in this matter related to the Plaintiffs' claim that Covelli incorrectly classified all of its Assistant Managers ("AMs") as exempt from the overtime provisions of the Fair Labor Standards Act ("FLSA") and that they can prove these misclassifications by common evidence.

2.   My qualifications for this project include my undergraduate and graduate education and my experience as an economist. I have a bachelor's degree in economics from the University of California at Berkeley. I have a doctorate in economics from the Massachusetts Institute of Technology. I am currently the president and chief executive officer of Economists Incorporated ("EI"), an economic consulting firm employing over thirty economists at offices in Washington, DC, California and Florida. EI's line of business is the analysis of topics arising in public policy, regulation, corporate management, corporate strategy and litigation. In addition to managing EI, I also consult. I have testified about economics issues by declaration, at deposition, and in state and federal court. In particular, I have testified in federal court regarding damages and liability in class action wage and hour cases. I have attached a copy of my curriculum vitae as an exhibit to this report. Therein, I describe my qualifications in greater detail. EI is being compensated for my work on this matter at my normal hourly rate of $675. Billing rates for other staff working with me on this matter range from $280 to $570. The opinions expressed herein are within my professional field of expertise and true to a reasonable degree of certainty.

3.  Covelli's counsel has asked me to consider whether certain theories regarding Covelli's profit motives and conduct are economically sensible. Specifically, they have asked whether Covelli would profit by purposefully creating an AM position with Covelli's actual pay grades for the primary purpose of performing the same routine tasks as the lowest paid employees at its cafés. They have also asked whether it is my opinion based on my experience and training as a labor economist that it would be valid and accurate to extrapolate from the experiences of Ms. Romano and Ms. Kis to draw conclusions about other AMs employed at different Covelli cafés. As I explain below, a) Plaintiffs' claims regarding Ms. Romano and Ms. Kis are not sensible economically; b) assuming that Ms. Romano and Ms. Kis are typical, Covelli had no profit motive to purposely misclassify the opt-ins generally and c) it would not be valid to draw inferences about other AMs' experiences based on Ms. Romano's and Ms. Kis's experiences without individualized analyses related to those other AMs.

## II.     Plaintiffs' Claims Regarding Ms. Romano and Ms. Kis Are Not Sensible Economically

4.  In the Complaints in this action, the Plaintiffs allege that AMs' duties are non-managerial. Ms. Romano alleges that, "Assistant Managers are not true managers and do not exercise management authority. Instead, among other things these purported 'managers' take customer orders, serve customers, cook food, work the cash register, check inventory, clean the store, and perform other non-managerial duties."[1] Ms. Kis alleges that AMs "did not perform executive or administrative functions as defined by the FLSA."[2]

5.  It makes no economic sense that Covelli would pay AMs as it does if the AMs' primary purpose, from Covelli's perspective, is to perform the low-wage functions that Plaintiffs say, tasks that were the primary duty for employees designated "associate." It would be significantly cheaper to hire associates at the associate pay scale to perform these tasks, regardless of whether doing so would trigger overtime. The more plausible explanation for Covelli's AM job in terms of profit-maximization is that Covelli wants sufficiently many managers for there to be at least one manager on duty at each café during most store hours, that it hires AMs to perform this management function in conjunction with the more senior General Managers ("GMs"), but that much of this management and supervisory activity can be done concurrently with other tasks. Both Ms. Romano and Ms. Kis testified that they were the only salaried manager on duty for substantial amounts of time.[3] Ms. Kis additionally testified that there were at least four and potentially as many as thirteen associates on shifts when she was the manager on duty.[4]

---

[1] Romano Complaint, paragraph 3.

[2] Kis Complaint, paragraph 32.

[3] Ms. Kis testified that she was the only manager on duty for approximately 25% of the hours she was in the café. (Kis 08/28/2018 Deposition, p. 22). Ms. Romano testified that she was the most senior manager on duty for approximately 3 ½ hours whenever she opened the café. (Romano 08/28/2018 Deposition, pp. 31-32).

[4] Kis 08/28/2018 Deposition, pp. 34-35.

6. If all that Covelli were interested in was a low-cost way to get minimum-wage work done, the obvious alternative would be to hire part-time associates to do the work. This would not only save the Defendant from paying AM salaries, but it would also save them from paying AM benefits. I understand that Covelli offers its AM employees a superior benefits package compared to its associates and shift supervisors including paid vacation time.

7. I have reviewed payroll data that Covelli has produced regarding Ms. Romano and Ms. Kis.[5] These data make clear that in their particular cases Covelli had no profit incentive to employ them for non-exempt work but misclassify them as exempt merely to avoid paying overtime. If Ms. Romano's and Ms. Kis's primary duties were the same as café associates, then it would have been cheaper for Covelli simply to have hired non-exempt workers at non-exempt pay levels, classified them properly and paid them accordingly than to have misclassified the two plaintiffs as exempt. The data show that promoting Ms. Romano increased her pay significantly rather than decreasing it as the Complaints imply. Ms. Romano was working virtually full-time immediately prior to her promotion from shift supervisor to AM in September 2014, averaging 37.86 hours per week over the preceding five pay periods at an hourly wage of $9.50.[6] These pay and hours levels correspond to $719.26 per two-week pay period. Upon promotion, Ms. Romano's average weekly hours increased by 14% to 43.13,[7] but her pay increased disproportionately, increasing by $549.97, over 75%, to a biweekly salary of $1,269.23. If Covelli had simply retained Ms. Romano at her preexisting pay rate and had her work the same 43.13 hours per week as a non-exempt employee entitled to overtime, she would have earned $849.34 per two-week pay period on average including overtime. Covelli paid Ms. Romano $419.89 more per pay period as a salaried AM

---

[5] DEF000341-59.

[6] This calculation includes both regular and overtime hours and excludes the final two pay periods that Ms. Romano was paid on an hourly basis, as these appear to correspond to the four weeks she participated in management training.

[7] This calculation excludes the final pay period in which Ms. Romano appears to have worked as she appears to have worked only a portion of that pay period, as well as the final pay period which reflects only vacation hours.

exempt from overtime than it would have paid if it had her work the same hours but paid her as an hourly shift supervisor who earned overtime, nearly 50%.

8.  This comparison of Ms. Romano's pay before and after her promotion understates the financial harm that Covelli would inflict upon itself by promoting Ms. Romano to AM simply to have her do non-exempt, "associate-type" work without earning overtime. Ms. Romano was a shift supervisor, so Covelli was already paying her more than it needed to get non-exempt tasks done. The extra pay that shift supervisors earn relative to associates is presumably pay for supervisorial tasks that associates do not do. The fact that Covelli classifies shift supervisors as non-exempt does not mean that shift supervisors do not have managerial duties or that management is not their primary duty. Covelli may choose to classify shift supervisors as non-exempt notwithstanding that many shift supervisors may have sufficient managerial duties to qualify as exempt employees. If Covelli's goal in promoting Ms. Romano were truly to acquire an additional 5-6 hours per week of non-exempt, associate-type work without paying overtime (representing the increase in Ms. Romano's weekly hours after her promotion), it could have  increased the hours of its actual associates or hired new ones and paid for these additional hours at associate rates rather than shift supervisor rates or the still higher AM rates. Consequently, the appropriate way to evaluate Covelli's cost consequences of promoting Ms. Romano purportedly for the primary purpose of performing non-exempt tasks is to compare her pay as an AM, inclusive of benefit costs, to what Covelli's costs would have been if she had continued working 38 hours per week as a shift supervisor but Covelli had increased its associates' hours by six per week.

9.  As noted, Covelli raised Ms. Romano's pay by $549.97 per pay period when it promoted her and enhanced her benefits. As of September 2014, the minimum wage in Pennsylvania was $7.25. It would have cost Covelli $87 per pay period in wages to increase associates' hours by 6 per week (12 per pay period) to work the additional hours that Ms. Romano tended to work after her promotion. It makes no economic sense that Covelli chose to promote Ms. Romano and incur over $550 in incremental

employee costs per pay period just to get an additional 12 hours of work that it would only have had to pay associates $87 for.

10. Ms. Kis's pay data confirm that there was no profit incentive motivating Covelli to hire her to do non-exempt work either. Ms. Kis began working on a salaried basis as an AM in March 2017. According to Ms. Kis's payroll records, she worked an average of 44.41 hours per week while she was a salaried AM. (This calculation excludes the first and the final pay periods as Ms. Kis appears to have worked only a portion of those pay periods as a salaried employee.) At her deposition, Ms. Kis claimed that she worked extra time before and after her shifts inspecting and cleaning the parking lot before and after clocking in. She estimates that this parking lot work took 10 to 25 minutes per instance.[8] I am unaware of any documentary evidence supporting Ms. Kis's testimony regarding this off-the-clock work and it would require individualized analysis even to attempt to verify it, e.g., discovery from other café employees, discovery from Ms. Kis's family and social network and review of any documentary support such as digital recordings of the café parking lot. Ms. Romano's testimony that she never worked off the clock proves that it would be invalid to infer based on Ms. Kis's testimony that all other AM's experiences were similar.[9] Nevertheless, assume for purposes of cost comparison that Ms. Kis actually did work 25 off-the clock minutes before and after each shift for a total of 50 minutes every workday. This exceeds Ms. Kis's own estimate that off-the-clock work varied between 10 and 25 minutes per occurrence. Adding 50 minutes per shift and assuming 10 shifts per pay period brings Ms. Kis's average weekly hours up to 48.6 during the time that she was a salaried AM. In 2017, the minimum wage in Ohio was $8.15. At the minimum wage, Covelli would only have to pay associates $792.18 per pay period to work the hours that Ms. Kis did, inclusive of Ms. Kis's purported off-the clock work cleaning the parking lot. Instead, Covelli paid Ms. Kis $1,307.70. This represents a premium of $515.52 per pay period or 65%. As discussed above, this calculation understates the pay premium because it fails to

---

[8] Kis 08/28/2018 Deposition, p. 24.

[9] Romano 08/28/2018 Deposition, p. 55.

account for the incremental benefits that Covelli paid Ms. Kis relative to the benefits that it would have paid associates.

11. Some of the discussion above concerns Covelli hiring "true" associates at minimum wage as an alternative to employing Ms. Romano and Ms. Kis to act as glorified associates as they seem to allege. These analyses presume that workers were available to put in additional associate hours. This presumption is consistent with Ms. Romano's and Ms. Kis's testimony. Both plaintiffs declared that they routinely sent hourly workers home because there was not sufficient work for the hourly workers to do.[10] This excess supply of workers relative to Covelli's demands suggests that Covelli could have found associates to do Ms. Romano's and Ms. Kis's work if it had wanted to. However, Ms. Romano's and Ms. Kis's declarations leave open the question of whether associates would be paid minimum wage as opposed to a higher pay rate or whether there was excess supply of labor available to all of Covelli's cafés throughout the Collective Period rather than only being available to Ms. Romano's and Ms. Kis's cafés during the time they were employed as AMs.  As I discuss later in this declaration, local labor market conditions vary over geography and time. These issues related to the availability and cost of substitute labor are individualized rather than common. Demonstrating that a local labor market shortage made it more difficult to substitute associate hours for AMs in Johnstown, Pennsylvania in 2014 (Ms. Romano) or in Wadsworth, Ohio in 2017 (Ms. Kis) would not prove that labor shortages existed at other times during the Collective Period or at the cafés that Covelli operated elsewhere in Ohio, Pennsylvania and the other states implicated by Plaintiffs' collective action claims.

### III.    It Is Unlikely That Covelli Had a Profit Motive to Purposefully Misclassify Opt-Ins to Save on Overtime

12. Assuming that Ms. Romano and Ms. Kis are typical of the opt-ins to this putative collective action in terms of hours and pay, misclassifying opt-ins to avoid overtime would not be profitable for Covelli. Ms. Romano and Ms. Kis earned more as AMs

---

[10] Declaration of Erin E. Kis, 03/21/2018, p. 3; Declaration of Chelsea Romano, 03/20/2018, p. 3.

than they would have earned if they had been paid minimum wage (or even in Ms. Romano's case, her previous shift supervisor wage) for the first 40 hours per week of work and time and a half thereafter. For jobs paying above the minimum wage, market forces determine how much an employer must pay to attract and retain qualified employees, and exempt/non-exempt status has no effect on these market forces. Qualified employees in the local labor market will decide whether to accept an offer for a job (and similarly whether to keep the jobs they already have) based on the job alternatives available, the characteristics of the job in question and the pay. Relevant job characteristics include but are not limited to benefits, level of responsibility, tasks required, advancement opportunities, holidays honored and weekly hours.

13. Leaving aside overtime regulations, the minimum pay that an employer would have to offer to attract and retain qualified employees for a job having some defined set of characteristics would clearly be the same whether the pay was quoted in dollars per year, dollars per week or dollars per hour. For example, there is no reason for workers to prefer a 2,000 hour per year job that pays $20,000 per year over the same job and the same hours for which pay is $10 per hour. Pay is the same whether pay is quoted on an annual basis or an hourly basis.

14. Whether a job pays overtime does not affect the amount the employer must pay either. As a matter of arithmetic, for every salary, number of regular hours worked per year and number of overtime hours worked per year, there is a corresponding regular, hourly wage rate that would yield the same annual pay inclusive of overtime. For example, pay is the same if an employee is compensated $35,625 in annual salary for a job requiring 45 hours of work per week for 50 weeks per year as it is for the same job and same hours at a regular wage rate of $15 per hour plus time-and-a-half for overtime. If an employer could attract and retain qualified employees at $35,625 per year, there is no reason to expect that the same employer could not attract the same workforce by paying $15 per hour for regular time and $22.50 for overtime. The job requirements are the same by construction in the example. The worker's employment alternatives are the same by construction in the example, and the annual pay is the same by construction in the example. Applying this result to Covelli and assuming that Ms. Romano and Ms.

Kis are broadly similar to opt-ins in terms of annual pay and weekly hours, it did not matter to Covelli's labor bill that opt-ins were classified as exempt and earned salaries rather than being classified as non-exempt and earning the corresponding regular, hourly wages plus overtime. Generally speaking, if Covelli did not perceive that the AM job duties warranted an exemption, it would have had no incentive to classify the job as exempt and pay the salaries that it did rather than pay each opt-in the same total amount based on his or her corresponding regular, hourly wage rate.[11] Covelli would have expected to attract the same applicants, pay the same in employee costs and comply with the law.

15. This is not to say that misclassification is always inconsistent with profit maximization. Purposeful misclassification of job categories may occur at companies seeking to maximize profits for reasons that do not apply here. Inadvertent misclassification of individual workers within job categories may occur, but it requires individualized inquiry to ascertain.

16. Dishonest, profit-maximizing firms may misclassify jobs as a way to pay less than the minimum wage. That is not the case for Ms. Romano and Ms. Kis. They both earned significantly more in salary than they would have earned if they had been paid the minimum wage plus time and a half for overtime. Classifying them as exempt did not allow Covelli to skirt minimum wage laws. So long as Ms. Romano and Ms. Kis are broadly similar to the opt-ins in terms of pay and hours, Covelli was not motivated to purposely misclassify opt-ins to effectively pay less than minimum wage for non-exempt work.

17. Another potential explanation for purposeful misclassification is that companies may think that they can fool workers by surprising workers with longer than expected hours, thus fooling them into accepting lesser pay than they would otherwise require. This is not likely to be a profit maximizing strategy, and it does not appear to apply here. Lying about the obvious is generally unprofitable because the truth is quickly

---

[11] Theoretically an employer could avoid the costs of tracking employees' time by paying by salary rather than hourly wages. In the case at hand, Covelli tracks employees' time anyway. Moreover, such tracking costs may be trivial.

discovered. Workers will realize what the job's true hours and other job characteristics are virtually immediately. If employees have alternatives, and the job is one they would not take on if they were well informed, they will soon quit. If employees do not have reasonable alternatives, there is no reason to lie to get them to take the job in the first place. A corporate policy built on this type of deception is also unprofitable because it is likely to be difficult to implement. It would not be enough that a few key executives lie; the thousands of people employed at the Defendant's cafés who are involved in the hiring process or who are friends with the job applicants would have to lie too, knowing full well that they will be exposed as liars as soon as the new AM starts work.

18. The lying motive for misclassification is particularly inappropriate for Ms. Romano and other opt-in plaintiffs who were promoted into the AM job from other café positions. These opt-ins presumably knew beforehand what the AM hours would be.

### IV.    Variation in Job Duties

19. It is implausible that Covelli profited by employing Ms. Romano and Ms. Kis as relatively highly paid exempt AMs for the primary purpose of doing non-exempt work or that Covelli profited by employing opt-ins employed at similar pay levels and working similar hours as Ms. Romano and Ms. Kis for the primary purposes of doing non-exempt tasks. Nevertheless, full discovery may demonstrate that Ms. Romano's or Ms. Kis's primary duties were non-exempt. Covelli may have created the AM job for the primary purpose of supervising non-exempt workers, but that does not mean the Ms. Romano's and Ms. Kis's GMs deployed them in the way that Covelli envisioned for AMs in general. Their GMs may have deployed them primarily for non-exempt work regardless of the reason that Covelli created the AM job or whether Covelli could have gotten non-exempt tasks done at less cost. However, the same variation across AMs that makes it possible that Ms. Romano and Ms. Kis performed primarily non-exempt job duties also prevents any valid inferences about opt-ins' job duties based on Ms. Romano's or Ms. Kis's experiences. Proving that Ms. Romano's primary duties were non-exempt would not imply that Ms. Kis's primary duties were non-exempt or that any opt-in's primary duties were non-exempt. Similarly, proving that Ms. Kis's

primary duties were non-exempt would not imply that Ms. Romano's or any opt-in's primary duties were also non-exempt.

20. In circumstances such as those in this case where many individuals within an enterprise have the same job title yet report to different supervisors in different work locations subject to different working conditions over four or more years, actual job duties necessarily vary from person to person and perhaps over time. Variation could theoretically have been so extreme that some AMs' primary duties were managerial while others were not. For example, I have read and heard sworn testimony and reviewed survey responses in other litigation matters in which workers having the same job title who were employed at different times or at different stores within the same retail chain have described markedly different job duties and work environments. In particular, I have read survey responses and deposition testimony from assistant store managers at a retail chain who described drastically different levels of managerial responsibility. It is possible for individual AMs to have limited management responsibility although other AMs have extensive management responsibility. So long as it is plausible that any AMs could have sufficient management authority to qualify as exempt employees, then individualized analysis is necessary to determine whether any particular AM's actual duties were sufficient to qualify for an exemption.

21. In the case at hand, only Ms. Romano and Ms. Kis have testified at deposition, and the limited information available even from them indicates that individualized analysis is necessary to determine the breadth of any individual AM's management duties. For example, Ms. Kis testified that she has no idea how AMs at other Covelli locations in Ohio exercise their responsibilities.[12] Both Ms. Romano and Ms. Kis testified that they disciplined employees,[13] dealt with customer complaints,[14] conducted or participated in one or more employee interviews,[15] filled out paperwork, counted down drawers, and

---

[12] Kis 08/28/2018 Deposition p. 126.

[13] Romano 08/28/2018 Deposition pp. 26, 28; Kis 08/28/2018 Deposition pp. 91-92, 110-111, 116-117.

[14] Romano 08/28/2018 Deposition p. 77; Kis 08/28/2018 Deposition pp. 31, 33.

[15] Romano 08/28/2018 Deposition p. 45; Kis 08/28/2018 Deposition pp. 39-40.

counted down the safe at the end of the day.[16] However, Ms. Kis testified further that she was responsible for ordering food for her café.[17] On the other hand, Ms. Romano testified that she had responsibility for maintaining the safety, sanitation and appearance of the café,[18] leading new employee orientations[19] and setting up employees' computer training.[20] She also managed associates' hours by sending employees home,[21] sending them on break or pulling them off break.[22] She further testified that she was responsible for executing the café GM's plan when he was not in the café.[23]

## V.  Variation in Local Labor Market Conditions

22. Analysis of the claims in this case requires individualized consideration of local labor market conditions. Whether Covelli profited by hiring a given AM rather than spreading that AM's non-exempt tasks across non-exempt workers depends upon the availability of non-exempt workers to absorb the AM's hours and the prevailing pay rate for workers capable of associate work in the local area. The prevailing pay rate depends on the unemployment rate and minimum wage. Unemployment rates and minimum wage rates vary by geography and time.

23. I have prepared Table 1 to illustrate the variation in labor market conditions across Covelli's operating area and over the Collective Period. I report unemployment rates for the states Covelli operates in and for various metropolitan areas within those states. I also report state minimum wage rates. I report data separately as of February 2015 and July 2018 to show variation over time. Unemployment rates varied between 3.2% (Nashville Metropolitan Area in July 2018) and 6.8% (Memphis Metropolitan Area in February 2015) across the reported regions over

---

[16] Romano 08/28/2018 Deposition pp. 83, 104-105; Kis 08/28/2018 Deposition p. 42.

[17] Kis 08/28/2018 Deposition p. 42.

[18] Romano 08/28/2018 Deposition p. 82-83.

[19] Romano 08/28/2018 Deposition p. 65.

[20] Romano 08/28/2018 Deposition p. 82.

[21] Romano 08/28/2018 Deposition p. 17.

[22] Romano 08/28/2018 Deposition pp. 73-75.

[23] Romano 08/28/2018 Deposition p. 106.

this period. The fact that unemployment rates varied by 125% across this geographic area and over this period indicates that the availability of lower-skilled workers as alternatives to AMs may have varied markedly across opt-ins. The table understates the true degree of variation in labor market conditions across Covelli's operating region because not all local areas in which Covelli operates cafés are reported. Unemployment rates can vary markedly within states. For example, the unemployment rates for Cincinnati, Columbus, Cleveland and Ohio in the aggregate were all different from each other both in February 2015 and July 2018. Just across these four areas, unemployment rates as of February 2015 varied between 4.6% in Columbus to 6.2% in Cleveland. Other areas in Ohio, such as Wadsworth where Ms. Kis worked, may have had higher or lower unemployment than these four areas. State minimum wages were as much as $1.05 (14%) higher than the federal level at some times in some areas although the state minimums were less than the federal minimum, and thus meaningless, in other areas at other times. This indicates that Covelli's costs to substitute non-exempt associates for AMs might vary significantly across opt-ins.

## V.     Conclusions

24. Covelli had no profit motive to promote Ms. Romano to the AM position or hire Ms. Kis as an AM just to avoid paying overtime for non-exempt work. Ms. Romano's and Ms. Kis's actual overtime hours as AMs were limited, significantly fewer than they allege in their complaints. Moreover, the salaries, bonuses and benefits that Covelli paid Ms. Romano and Ms. Kis were much more than the compensation Covelli would have had to pay to have non-exempt workers put in the hours that Ms. Romano and Ms. Kis did as AMs. In Ms. Romano's case, Covelli could have paid significantly less by keeping Ms. Covelli on as a shift supervisor at her preexisting wage and paying her overtime. In both Ms. Romano's and Ms. Kis's cases, Covelli could have reallocated their hours to associates if its goals were simply to get non-exempt work done, thereby paying significantly less in employee compensation than it actually paid. The only plausible explanation that I am aware of for Covelli to have paid Ms. Romano and Ms. Kis as much as it did is that it expected them to perform different duties than associates,

even if those different duties could be performed concurrently with other tasks that non-exempt workers did too.

25. Generally speaking, employers like Covelli that pay salaries like Covelli paid Ms. Romano and Ms. Kis have no overtime-related incentive to purposely misclassify jobs. For each AM paid similarly as Ms. Romano or Ms. Kis, Covelli could have  set an hourly wage such that total pay inclusive of overtime would have been the same as the salary that Covelli actually paid. This arrangement would have cost it the same.

26. Although it is implausible that Ms. Romano, Ms. Kis or similarly situated opt-ins were purposely misclassified to save on overtime, it is possible that Ms. Romano, Ms. Kis or any given opt-in was misclassified. AMs' actual job duties will vary across supervisors, cafés and perhaps regions. I am aware of drastic variation in the level of responsibility delegated to different assistant managers within other retail chains. Ms. Romano's and Ms. Kis's deposition testimony indicates that there is variation here too. Because individual experiences vary and any given GM may utilize the AMs reporting to him or her in ways that are inconsistent with Covelli's profit interest, it is possible for a given AM's primary duties to be non-exempt tasks. However, it would be necessary to review experiences at the individual level to determine whether Ms. Romano's, Ms. Kis's or any other particular opt-in's actual duties were insufficient to warrant an exemption. Showing that Ms. Romano's duties were insufficient for an exemption would not imply that the same was true for Ms. Kis and vice versa. Similarly, showing that either or both of their duties were insufficient for an exemption would not imply the same for other opt-ins.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 5, 2018.

Jonathan Walker

**14**
*Economists Incorporated*

**Table 1**: **Unemployment Rates and Minimum Wages in States with Covelli Panera Locations and Major Metropolitan Areas in Those States**

| State or Metropolitan Area | Unemployment Rate (%) | | Minimum Wage ($) | |
|---|---|---|---|---|
| | February 2015 | July 2018 | February 2015 | July 2018 |
| Florida | 5.60 | 4.00 | 8.05 | 8.25 |
|     Miami-Fort Lauderdale-West Palm Beach, FL | 5.50 | 4.10 | | |
|     Tampa-St. Petersburg-Clearwater, FL | 5.40 | 3.80 | | |
|     Orlando-Kissimmee-Sanford, FL | 5.40 | 3.60 | | |
|     Jacksonville, FL | 5.60 | 3.80 | | |
| Georgia[3] | 6.30 | 4.00 | 5.15 | 5.15 |
|     Atlanta-Sandy Springs-Roswell, GA | 6.00 | 3.80 | | |
| Kentucky | 6.00 | 4.90 | 7.25 | 7.25 |
|     Louisville–Jefferson County, KY-IN | 5.30 | 4.50 | | |
| North Carolina | 5.90 | 4.10 | 7.25 | 7.25 |
|     Charlotte-Concord-Gastonia, NC-SC | 5.70 | 3.80 | | |
|     Raleigh-Cary, NC | 4.80 | 3.50 | | |
| Ohio | 5.60 | 4.90 | 8.10 | 8.30 |
|     Cincinnati, OH-KY-IN | 5.10 | 4.30 | | |
|     Columbus, OH | 4.60 | 4.10 | | |
|     Cleveland-Elyria, OH | 6.20 | 5.50 | | |
| Pennsylvania | 5.80 | 4.50 | 7.25 | 7.25 |
|     Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 5.90 | 4.60 | | |
|     Pittsburgh, PA | 5.80 | 4.40 | | |
| South Carolina | 6.50 | 3.50 | 7.25 | 7.25 |
| Tennessee | 6.20 | 4.00 | 7.25 | 7.25 |
|     Nashville-Davidson–Murfreesboro–Franklin, TN | 4.90 | 3.20 | | |
|     Memphis, TN-MS-AR | 6.80 | 4.70 | | |

Sources:

1. www.covelli.com/panera-bread-locations

2. BLS Local Area Unemployment Statistics, https://data.bls.gov/PDQWeb/la. Accessed October 30, 2018.

3. https://fred.stlouisfed.org

4. https://www.minimum-wage.org

Notes:

1. Metropolitan statistical areas are those with 2017 estimated population greater than 1 million.

2. Except in limited and temporary instances, municipalities in the metropolitan areas in these states have had the same minimum wage as the state (see, e.g. http://laborcenter.berkeley.edu/minimum-wage-living-wage-resources/inventory-of-us-city-and-county-minimum-wage-ordinances/; https://www.epi.org/minimum-wage-tracker/ ).

3. Georgia's minimum wage ($5.15) was below the federal minimum wage ($7.25) in both February 2015 and July 2018.

Economists
INCORPORATED

# JONATHAN L. WALKER

**Office**

Economists Incorporated
101 Mission Street, Suite 1000
San Francisco, CA  94105
Direct:  (415) 975-3223
Main Office:  (415) 975-5510
Fax: (415) 281-9151
walker.j@ei.com

**Education**

Ph.D., Economics, Massachusetts Institute of Technology, 1991

A.B., Economics, University of California, Berkeley, 1983

**Fellowships, Honors and Awards**

1986:  American Economic Association Doctoral Fellowship

1983:  National Science Foundation Graduate Fellowship

1983:  Honors in General Studies, University of California, Berkeley

**Fields of Concentration**

Industrial Organization, Labor Economics, Economic History

**Professional Experience**

2003 – Present:  President, Economists Incorporated

2001 – 2002:  Principal, Economists Incorporated

1998 – 2000:  Senior Vice President, Economists Incorporated

1996 – 1998:  Vice President, Economists Incorporated

1990 – 1996:  Senior Economist, Economists Incorporated

**Professional Experience (continued)**

> 1988 – 1990:  Management Consultant, Monitor Company, Cambridge, Massachusetts
>
> 1987 – 1988:  Visiting Research Fellow, Federal Reserve Bank of Boston, Boston Massachusetts
>
> 1987:  Teaching Assistant Massachusetts Institute of Technology

**Dissertation**

> *Essays on the Commercial Banking Industry*

**Publications**

> "Discounting Lost Future Earnings," *Economists Ink*, Summer 2015 (with Erica Greulich)
>
> "DTB and the Use of Regression Analysis to Assess Market Definition and Competitive Effects," *Antitrust Law Section of the American Bar Association*, Economics Committee Newsletter, Spring 2011 (with Erica Greulich)
>
> "Preparing for Trial:  Expert Economic Testimony," *Antitrust Section of the American Bar Association 59th Spring Meeting*, Continuing Legal Education Written Materials, March 2011
>
> "The Single Entity Issue in American Needle and DTB," *Westlaw Journal Antitrust*, Volume 18, Issue 1, April 2010 (with Erica Greulich)
>
> "Event Studies, Toxic Stock and Non-Compete Provisions," *Economists Ink*, Fall 2005
>
> "Statistical Evidence and a Daubert Challenge in a Recent Discrimination Case," *Economists Ink*, Summer 2004
>
> "Price Increases Attributable to Patent Infringement or Entry," *Economists Ink*, Spring 2004 (with Tessie Su)
>
> "Ninth Circuit Expounds on Antitrust Injury," *Economists Ink*, Fall 2003
>
> "The Deterrence Value of Punitive Damages," *Economists Ink*, Fall 2001 (with Laura Malowane)

**Publications (continued)**

"Recent Development in Bank Merger Competition Policy," *Banking Law Review*, Spring 1992 (with Bruce Snapp and David Balto)

"U.S. Bank Merger Competition Policy," *International Merger Law 16*, December 1991 (with Bruce Snapp)

"Not So Safe Harbor for Bank Mergers," *Economists Ink*, Winter 1991

**Panels**

*87th Annual Conference of the Western Economics Association International, "Sports Economics on Trial,"* June 30, 2012 – Symposium panelist

*American Bar Association Antitrust Section Annual Meetings, March 9, 2011 –* Presentation concerning preparation for economic trial testimony

*American Law Institute – American Bar Association Course of Study, "Antitrust Law in the 21st Century," September 14-15, 2000 –* Presentation concerning the economics of professional sports leagues

*American Bar Association Antitrust Section Annual Meetings, April 14, 1999 –* Presentation concerning the economic foundations of antitrust law

*National Economists Club Educational Foundation, "What Effect Will Financial Restructuring Have On Banks?"* August 13, 1991 – Moderator

**Board Memberships**

Economists Incorporated

SF-Marin Food Bank

**Expert Reports and Testimony**

*In Re:  Processed Egg Products Litigation –* Expert reports (4), class decertification declaration, hearing testimony, deposition testimony and class trial testimony on behalf of defendants concerning antitrust damages and liability

*Anne Roty and Mary Neff v. Battelle Memorial Institute, et al. –* Expert report on behalf of defendants concerning statistics

*Bobby Jones et al. v. Progressive Direct Insurance Co. et al. –* Expert report and declaration on behalf of defendant concerning class certification and damages

**Expert Reports and Testimony (continued)**

*In Re: Aaron Slator* – Export report and arbitration testimony on behalf of respondent concerning contract damages

*All-South Subcontractors, Inc. v. Sunbelt Rentals, Inc.* – Expert report on behalf of defendant concerning class certification

*Federal Deposit Insurance Corporation v. PricewaterhouseCoopers LLP and Crowe Horwath LLP* – Expert report and deposition testimony on behalf of plaintiffs concerning damages

*Precision Spine, Inc. and Spinal USA, Inc. v. Zavation, LLC et al.* – Expert report and deposition testimony on behalf of plaintiffs concerning damages

*Chicago Teachers Union et al. v. Board of Education of the City of Chicago et al. (Case No. 12-C-10311)* – Expert reports (3), declaration and deposition testimony on behalf of plaintiffs concerning liability

*Chicago Teachers Union et al. v. Board of Education of the City of Chicago et al. (Case No. 12-C-10338)* – Expert reports (2) and deposition testimony on behalf of plaintiffs concerning liability

*Charles Ridgeway, et al. v. Wal-Mart Stores, Inc.* – Expert report, trial and deposition testimony on behalf of defendant concerning class injury and damages

*Daniel Villalpando, et al. v. Exel Direct Inc., et al.* – Expert report and deposition testimony on behalf of defendants concerning class damages

*United States* ex rel. *Landis v. Tailwind Sports Corp., et al.* – Expert report, declaration and deposition testimony of behalf of plaintiff concerning damages

*The West Virginia Investment Management Board et al. v. The Variable Annuity Life Insurance Company* – Expert report and deposition testimony on behalf of defendant concerning damages

*In Re: Taco Bell Wage and Hour Actions* – Expert reports (2), deposition and trial testimony on behalf of defendant concerning liability and remedies

*Peter Sripramot v. Nor Cal Freight Mgmt., Inc., et al.* – Expert report on behalf of defendant concerning damages

*Moroccanoil Inc., v. Marc Anthony Cosmetics, Inc., et al.* – Expert report and deposition testimony on behalf of plaintiff concerning trademark infringement remedies

## Expert Reports and Testimony (continued)

*Isidro Baricuatro, Jr., et al. v. Industrial Personnel and Management Services, Inc., et al.* – Expert report and deposition testimony on behalf of defendants concerning Fair Labor Standards Act and contract damages

*Ameira Watters v. General Motors LLC, et al.* – Expert report on behalf of defendants concerning damages

*Louis Cimaglia v. Royal Pontiac Buick GMC Inc., et al.* – Expert report on behalf of defendants concerning damages

*Harris County, Texas et al. v. International Paper Company, et al.* – Expert report and deposition testimony on behalf of defendants concerning punitive damages

*United States v. Bank of America Corp. et al.* – Expert report and deposition testimony on behalf of defendants concerning financial harm

*Diane Zwarg v. BB&T Insurance Services of California, Inc., et al.* – Trial and deposition testimony on behalf of defendants concerning damages

*Ritchie Risk – Linked Strategies Trading (Ireland), Ltd., et al. v. Coventry First LLC, et al.* – Expert report and deposition testimony on behalf of defendants concerning economic loss

*In Re:  BDO Seidman* – Expert report and deposition testimony on behalf of defendant concerning damages from alleged breach of professional responsibility

*U.S. SEC v. Ralph Cioffi* – Deposition testimony on behalf of defendant concerning hedge fund operations

*Ultra Internet Media, S.A., et al. v. Caesars License Company, LLC et al.* – Expert report on behalf of defendants concerning damages

*Lauren Knowles v. Kelly Buick, Inc., et al.* – Expert report on behalf of defendants concerning economic loss

*Kenneth D. Klaas, et al. v. Vestin Mortgage Inc., et al.* – Expert reports (2) on behalf of defendants concerning contract damages

*Tyr Sport, Inc. v. Warnaco Swimwear, Inc., United States Swimming, Inc., et al.* – Expert report on behalf of defendants concerning antitrust liability

*United States of America v. Ralph Cioffi and Matthew Tannin* – Testimony at criminal trial on behalf of defendants concerning hedge fund operations

## Expert Reports and Testimony (continued)

*Charles M. Felton et al. v. Vestin Realty Mortgage II, et al.* – Deposition testimony and testimony at a bench trial on behalf of defendants concerning contract damages

*National Union Fire Insurance Co. of Pittsburgh, PA v. Puget Plastics Corporation et al.* – Deposition testimony and testimony at a bench trial on behalf of plaintiff concerning lost profits and diminution in business value

*Deutscher Tennis Bund, et al. v. ATP Tour Inc.* – Expert reports (2), deposition testimony and testimony at a jury trial on behalf of defendant concerning antitrust liability

*John Johnson, et al. v. Big Lots Stores, Inc.* – Expert reports (2), declarations (2), deposition testimony, and testimony at a bench trial on behalf of defendant concerning alleged violation of Fair Labor Standards Act.

*MGP Ingredients, Inc. v. Mars, Inc. and S&M NuTec, LLC* – Expert report and deposition testimony on behalf of defendant concerning damages

*In Re:  H Street Building Corporation* – Deposition testimony on behalf of defendant concerning damages

*In Re: The National Benevolent Association of the Christian Church (Disciples of Christ), et al.* – Expert report, rebuttal report and deposition testimony on behalf of plaintiff concerning damages

*Chemical Overseas Holdings Inc., et al. v. Republica Oriental Del Uruguay, et al.* – Expert report, supplemental report and arbitration testimony on behalf of respondents concerning damages

*In Re:  Lockheed Meridian, MS Shooting Incident* – Expert reports (3) and deposition testimony on behalf of defendant concerning damages

*John D. Wee v. Charles Schwab & Co., Inc.* – Arbitration testimony on behalf of plaintiff concerning damages

*In Re:  Robin Singh d/b/a Test Masters* – Expert reports (2), declaration and deposition testimony on behalf of plaintiff concerning damages

*Patrick J. Cunningham and Anton N. Zanki v. International Business Machines Corporation* – Expert report, rebuttal report and deposition testimony on behalf of defendant concerning alleged breach of contract

**Expert Reports and Testimony (continued)**

*Mark Hodges, et al. v. Greater Canton Ford Mercury, Inc., et al.* – Expert report on behalf of defendant concerning punitive damages

*In Re: Frank T. Vega* – Declaration on behalf of defendant concerning damages

*Martin Leach v. Ford Motor Co.* – Expert report on behalf of defendant concerning the corporate officer labor market in a breach of contract suit

*Westways World Travel, Inc. and Sundance Travel Service v. AMR Corp., et al.* – Expert report and deposition testimony on behalf of defendants concerning compensatory damages

*Traci A. Savage v. Ford Motor Co.* – Expert report on behalf of defendant concerning the economics of punitive damages

*Randy Eugene Wheeler v. Ford Motor Co.* – Deposition testimony on behalf of defendant concerning lost NFL earnings and other alleged damages

*David Braswell v. Holley Performance Products Inc.* – Expert report and rebuttal on behalf of defendant concerning antitrust liability and antitrust damages

*Ertha Mae Williams v. CSX Transportation Inc., et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*R. Straman Co. and Newport Convertible Engineering, Inc. v. Volkswagen of America, et al.* – Deposition testimony on behalf of defendants concerning antitrust liability and antitrust injury

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc. and Conopco, Inc.* – Testimony at jury trial on behalf of defendants regarding compensatory damages for alleged breach of contract and false promise

*Newhall Land and Farming Co. v. Kerr McGee Operating Corporation, et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*Marcia Spielholz, et al. v. Los Angeles Cellular Telephone Company, et al.* – Expert report on behalf of defendants concerning remedies in a class action false advertising suit

*David N. Orrik v. Stryker Corporation, et al.* - Deposition testimony on behalf of defendants concerning the economics of punitive damages

**Expert Reports and Testimony (continued)**

*Agneta Karlsson, et al. v. Michael A. Savage* – Deposition testimony on behalf of defendants concerning the economics of punitive damages and product liability

*Homestore, Inc. v. America Online* – Expert report and arbitration testimony on behalf of respondent concerning damages from breach of contract

*Michael Meitus, et al. v. Dain Rauscher Wessels, Dain Rauscher Corporation and Dain Rauscher Inc.* – Arbitration testimony on behalf of claimants concerning the competitive structure of the securities industry and other economic matters

*In Re: 1994 Exxon Chemical Plant Fire* – Expert report on behalf of defendant concerning the economics of punitive damages

*Avis Buchanan, et al v. Consolidated Stores Corp.* – Declaration and deposition testimony on behalf of defendant concerning statistical and other economic analyses in a class action public accommodations suit

*State of Alabama v. Exxon Corporation* – Affidavit and testimony at post- trial hearing on behalf of defendant concerning the economics of punitive damages

*Aspen Knolls Corp., et al v. McDermott Will & Emery* – Expert report on behalf of defendant concerning damages in a legal malpractice suit

*Legi-Slate Inc. v. Thomson Information Services Inc.* – Expert reports (2) and deposition testimony on behalf of plaintiff concerning damages from breach of contract

*United States of America ex rel., William I. Koch and William A. Presley v. Koch Industries, Inc., et al.* – Expert report, deposition testimony and testimony at jury trial on behalf of defendants concerning economic issues in a False Claims Act suit

*Ronald O. Lewis v. Booz-Allen & Hamilton Inc.* – Expert reports (4) and deposition testimony on behalf of plaintiff regarding statistics and damages in an employment discrimination suit

*Richard Rogers Mason v. Ford Motor Company* – Expert report and deposition testimony on behalf of defendant regarding liability in a product liability suit

*Dr. Michael J. Galvin v. The New York Racing Association, Inc., et al.* – Expert report and declaration on behalf of defendant regarding commercial damages in breach of due process and tortious interference suit

## Expert Reports and Testimony (continued)

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc., et al.* – Deposition and bench trial testimony on behalf of defendants regarding business valuation and damages in a breach of contract and fraudulent misrepresentation suit

*Yvonne Trout, et al. v. John Dalton, et al.* – Affidavit and declaration on behalf of the United States concerning prejudgment interest

*Willie Brown Jr., et al. v. General Motors Corporation* – Testimony at deposition and jury trial concerning lost NFL player earnings

*Royer Homes of Mississippi, Inc., et al. v. Redman Homes, Inc., et al.* – Affidavits (2), expert reports (2) and deposition testimony on behalf of defendants concerning antitrust liability and damages

*W. C. and A. N. Miller Companies v. United States of America* – Expert report and deposition testimony on behalf of defendant concerning commercial damages in a Federal Tort Claims Act suit

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corporation* – Expert report and deposition testimony on behalf of defendant concerning antitrust damages and liability

*Francis W. Murray and FWM Corporation v. National Football League, et al.* – Expert report and deposition testimony on behalf of defendants regarding market definition, alleged anticompetitive conduct and alleged antitrust injury

*Michael A. Willner v. Dow Jones & Company, Inc., et al.* – Deposition testimony on behalf of defendants regarding damages in a breach of contract and unfair dealing suit

*Dream Team Collectibles, Inc. v. NBA Properties, Inc.* – Expert reports (2) and deposition testimony on behalf of NBA Properties regarding damages and other economic issues in a trademark infringement suit and counter suit

*Breezevale Limited v. Timothy L. Dickinson, et al.* – Deposition and jury trial testimony on behalf of defendants regarding commercial damages in a legal malpractice suit

*Sonja Lumpkin v. Citizens Bank of Maryland, Incorporated* – Affidavit on behalf of defendant regarding damages in a wrongful termination suit

Economists
INCORPORATED

**Expert Reports and Testimony (continued)**

*Carolee Brady Hartman, et al. v. Joseph Duffey* – Declarations (7) and live testimony at four Teamsters Hearings on behalf of the defendant, the United States Government, regarding damage estimation in a class action sex discrimination suit

*Robert B. Reich v. Charles I. Brown, Peter M. Mazula, and Ronald F. Nuzman* – Affidavit and deposition testimony for the United States Department of Labor regarding alleged breach of fiduciary responsibility under ERISA

*United Farmers Agents Association, Inc. v Farmers Insurance Exchange, et al. and Thomas J. Vinson, et al. v Farmers Insurance Exchange, et al.* – Affidavit and deposition testimony for plaintiffs regarding antitrust liability

*Anthony Brown, et al. v Pro Football, Inc.* – Testimony for defendants, the member clubs of the NFL, at jury trial regarding antitrust damages

*Robert E. Connor, et al. v. Harris County, et al.* – Deposition testimony and a written declaration for plaintiffs, members of a class of job applicants, regarding a cost defense for allegedly discriminatory employment practices

*Laura Kelber against Forest Electric Corp. and Forest Datacom* – Affidavit in opposition to defendants' motion for summary judgement in a sex discrimination suit

**Selected Consulting Matters**

*Ernst & Young/ KPMG* – Antitrust consulting regarding potential consolidation

*NASCAR Souvenirs* – Consulting for defendants concerning class certification in an antitrust matter

*First Databank* – Antitrust consulting regarding acquisition of Medi-Span Inc.

*Metal Supermarkets* – Consulting for plaintiff regarding commercial damages arising from legal malpractice

*Vulcan* – Antitrust consulting regarding the acquisition of an Atlanta quarry

*Brodus v. Children's National Medical Center* – Consulting regarding damages in a wrongful termination suit

*International Paper* – Antitrust consulting regarding photographic paper and other photographic material

**Selected Consulting Matters (continued)**

*St. Louis Convention and Visitors Commission v. National Football League, et al.* – Antitrust consulting regarding franchise relocation

*The Baltimore City Paper* – Consulting regarding commercial damages allegedly arising from libel

*Allied Domecq* – Consulting for liquor supplier regarding terminated dealer's lost profits

*National Football League* – Consulting regarding trademark and antitrust issues in suits between the Dallas Cowboys and its affiliates and the NFL

*IndyCar Racing* – Antitrust consulting

*Albertson's* – Antitrust consulting for potential plaintiff in a price-fixing matter

*New Orleans Hospitals* – Antitrust consulting regarding joint venture among New Orleans hospitals

*General Dynamics* – Consulting for plaintiff regarding damages in commercial litigation

*Telecom Technical Services, et al. v. ROLM* – Consulting for plaintiffs in antitrust litigation

*The Boston Herald* – Consulting regarding damages allegedly caused by publication of a news story

*Automotive Dismantlers and Recyclers Association v. ADP Claims Solutions Group, Inc.* – Antitrust consulting regarding used automobile parts databases

*Mercy/St. Vincent* – Consulting regarding the merger of two hospital systems in Toledo, Ohio

*Kalium/IMC* – Consulting regarding the merger of Kalium and IMC

*Agricultural Chemicals Antitrust Litigation* – Antitrust consulting for defendants, Zeneca Corp., Helena Corp. and Terra Corp. in an RPM class action suit

*The Clorox Company v. Sterling Winthrop, Inc., et al.* – Antitrust consulting for plaintiffs in litigation alleging misuse of trademark protections for anticompetitive gain

Economists
INCORPORATED

**Selected Consulting Matters (continued)**

*Chittenden Corporation* – Antitrust consulting regarding a bank holding company's acquisition plans

*National Basketball Association* – Damage estimation for the NBA in antitrust suit brought against it by Independent Entertainment Group Incorporated

*Magic Line Inc.* – Merger of ATM networks

*Home Shopping Network* – Ex-post valuation of contingent contract concerning software and consulting services

*Lenfest Group, Comcast Corporation and Telecommunications Incorporated* – Consultation regarding Delaware Public Service Commission rules to implement the Telecommunications Technology Investment Act

*Worthen Financial Corporation* – Acquisition of Union National Bank of Arkansas

*Intrust Bank* – Merger with Kansas State Bank & Trust

*Iowa National Bankshares* – Merger with MidAmerica Savings Banks

*First National Bank of Kerrville* – Acquisition of Bank of Kerrville

*Peoples Heritage Financial Group* – Acquisitions of Mid Maine Savings Bank, Bank of New Hampshire, CFX, and certain branches of Fleet Bank of Maine

*Potash Antitrust Litigation* – Antitrust consulting for defendants in a class action suit alleging price fixing in the potash industry

*R&D Business Systems, et al. v. Xerox Corporation* – Antitrust consulting for plaintiffs in a class action suit alleging tying and monopolization in the copier and printer industries

*Society Corp.* – Acquisition of Ameritrust

*VDDE Holm, Voest Alpina, Bohler* – Antitrust consulting in connection with the merger of two European steel manufacturers

*McNeil, et al. v. NFL* – Estimation of damages resulting from player reservation system

*U.S Department of Justice v. City of Alhambra, California* – Analysis of evidence of discriminatory hiring practice

Economists
INCORPORATED

**Selected Consulting Matters (continued)**

> *Christiana Mortgage Brokers, et al. v. Delaware Trust, et al.* – Estimation of damages resulting from tortious interference in the mortgage brokerage industry in New Castle County, Delaware
>
> *Merger of Two Savings and Loan Assns.* – Antitrust consulting in connection with the merger of two thrift institutions
>
> *Mid Atlantic Coca-Cola* – Analysis of evidence of price fixing and estimation of resulting damages

**Professional Societies**

> American Economic Association
>
> American Bar Association
>
> Industrial Organization Society
>
> Western Economics Association
>
> American Law and Economics Association
>
> Society of Labor Economics